# United States Court of Appeals
## For the First Circuit

No. 12-2023

UNITED STATES,

Appellant,

v.

ANTHONY DAPOLITO,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch, Chief Judge,
Howard, Circuit Judge,
and Casper,<sup>*</sup> District Judge.

Margaret D. McGaughey, Assistant U.S. Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for appellant.
David Beneman, Federal Defender, for appellee.

April 11, 2013

<sup>*</sup> Of the District of Massachusetts, sitting by designation.

**LYNCH, Chief Judge**.  This is an appeal by the government from the district court's grant of defendant Anthony Dapolito's motion to suppress evidence (a firearm) as the fruits of an unconstitutional detention.  United States v. Dapolito, No. 2:12-cr-00045-NT, 2012 WL 3612602 (D. Me. Aug. 21, 2012).

The prosecution does not challenge on appeal the district court's findings of historical fact.  Rather, it argues that the district court committed three legal errors, in that the district court: (1) failed to apply the correct test for when a consensual encounter matured into a stop under Terry v. Ohio, 392 U.S. 1 (1968); (2) failed to consider the totality of the circumstances in its reasonable suspicion analysis; and (3) substituted its judgment for that of the officers in this case.  These errors, the U.S. asserts, mean that the district court erred in concluding that the totality of the circumstances did not provide a reasonable suspicion to support the defendant's continuing detention at the time of the search, which produced the firearm.

We find no error and affirm.  The court employed analyses and reached conclusions consistent with the relevant law, including Terry, United States v. Arvizu, 534 U.S. 266 (2002), and United States v. Sokolow, 490 U.S. 1 (1989).

I.

On Friday, March 9, 2012, with temperatures warm enough for police bicycle patrols, officers Dan Knight and Richard Ray

-2-

cycled past Monument Square, a public pedestrian square, in the heart of downtown Portland, Maine. At about 2:39 a.m., they saw the defendant, Anthony Dapolito, appearing to be in his thirties and wearing a jacket, standing alone in an alcove at 18 Monument Square.

The district court, which viewed the scene, described the alcove:

> From the sidewalk [looking toward the alcove], there are two doorways within the alcove. The first doorway, which is roughly in the center of the alcove, is the entryway for [Shay's Grill Pub]. To the right of the Shay's entrance is a second door allowing access to condominiums on the upper floors. To the right of the condominium entrance is a small ATM machine, which is shielded by a canvas enclosure. The defendant was standing in the area directly in front of the door to the condominiums.

Dapolito, 2012 WL 3612602, at *1.[1]

Ray spoke to Dapolito, and Dapolito responded that "everything's okay," but Dapolito was also grimacing, squinting, and making strange facial expressions. The officers got off their bikes and walked over to Dapolito. The officers observed that Dapolito appeared to be intoxicated or otherwise impaired. His face was sweaty and he was fidgeting with his hands.

---

[1] The record indicates that Shay's was closed at that hour, but does not reveal whether other businesses in the area were open. However, Ray testified that he did not see anyone else in the square.

The officers testified that they were patrolling the "downtown area" because there had been "recent" burglaries of businesses and graffiti incidents, though they had no information about any recent burglaries or criminal activity in this particular location, and did not say how recent these reported downtown burglaries had been. The "downtown area" is a large area, and includes the Old Port section of Portland, of which Monument Square is a part. Ray did not know whether any burglaries had occurred in Monument Square in the past month. As Knight testified, the officers saw no evidence that Dapolito was or had been involved in a burglary and he did not appear to have any of a burglar's usual tools.

Neither officer recognized the defendant. Ray asked the defendant for identification. Dapolito replied that he did not have any identification on his person, but voluntarily provided his name, and accurately gave his date of birth and said he was from Saugus, Massachusetts. He also provided a middle initial "M." The police report filed added that Dapolito said he had a Massachusetts driver's license. There is no evidence that Dapolito hesitated or paused before giving this information.

The officers said the defendant spelled his name for them as "D-A-P-L-I-T-O," with the middle "O" missing. The district court found that "the Defendant either unintentionally misspelled his name . . . or that Officer Ray misheard him." Ray then

-4-

contacted dispatch and requested that dispatch search for a record of the defendant.  Dispatch responded that no record was found for that name in Maine or Massachusetts.[2]  Ray told Dapolito that the name was not on file and asked if he had the name right.  Dapolito spelled his last name as "D-A-P-O-L-I-T-O," which is the correct spelling.  Ray asked dispatch to do another search; once again, dispatch found no record in its computer system.

Ray testified that he believed Dapolito was lying about his identity given the first misspelling and the inability of dispatch to confirm the second (correct) spelling.  He thought it common practice for people to lie about their names when they are wanted, and so suspected Dapolito was wanted on a warrant.  Ray then asked Dapolito if he could pat him down for identification; Dapolito refused and said he was not comfortable being touched.

The officers asked what Dapolito was doing there and where he lived.  Dapolito told Ray he was waiting for some friends. He also said that he lived at 18 Monument Square.  However, Dapolito did not have a key to the condominiums, and could not provide the phone numbers of his supposed roommates because his cell phone battery was dead.  He also made rambling and incoherent statements, including that if one subtracts 100 from 118, one gets

---

[2] Ray did not know what records Massachusetts kept, but understood that a dispatch search checks for both motor vehicle records and National Crime Information Center (NCIC) data, which includes outstanding warrants, bail conditions, and prior felony convictions.

18, an apparent reference to the 18 Monument Square address. Knight pressed the buzzer for the condominiums, but no one responded.

For a second time, Ray asked Dapolito if he could search him for identification. Again, Dapolito refused and said he was not comfortable with that. However, Ray saw what looked like the outline of a credit card or a license in Dapolito's left front pants pocket, and asked Dapolito what it was. Dapolito took it out of his pocket and showed it to Ray. The card was a government-issued Massachusetts Electronic Benefit Transfer (EBT) card. The card had Dapolito's name on it, spelled the same way as the second spelling of the name he had given the officers, but it did not have a photo identification. Despite the fact that the card confirmed Dapolito's name and his association with Massachusetts, the officers continued the interrogation.[3]

In fact, at some point during the questioning, Officer Christopher Dyer, having heard over his car radio about the two bicycle officers' encounter, and thinking it odd that the encounter had lasted fifteen minutes without more radio traffic, decided, on his own, to drive his police cruiser onto Monument Square, where vehicles are not ordinarily permitted. He arrived at approximately 2:54 a.m., got out, and approached the officers and Dapolito.

---

[3] The record is not clear about how much time had elapsed by this point, but it occurred well into the encounter, which lasted upwards of twenty minutes.

Dapolito now had three officers facing him, and a cruiser on scene, as he stood in the alcove, at the point where the paving changed from the alcove's stones to the brick sidewalk.

Ray continued to question Dapolito because, in his view, according to the police report, the information the defendant was providing the officers "wasn't adding up" and he "deemed it necessary to detain [Dapolito] in order to discover his identity." The next sentence of the report moved from the officers' "need to discover" Dapolito's identity to the statement, "I believed he could possibly be a burglar or a wanted person using a false name to evade capture." By now, the encounter had lasted at least 20 minutes.

Ray went a step further, and at this point, told Dapolito that he, Dapolito, was being deceitful, that Dapolito was going to be detained, and more specifically, that Dapolito was going to be brought to the county jail.[4] Ray also told Dapolito he would be searched for identification.

In response to being told he was going to be taken to jail, and after he had twice refused requests that he agree to be searched, Dapolito took what the officers identified as a "fight-or-flight" stance. At that point Dyer moved closer to Ray, Knight, and Dapolito. Dapolito said "I don't want that," and asked

---

[4] There, the police could have used a fingerprint machine or a record of tattoos to attempt to identify the defendant.

if he could have permission to take three steps back. Ray said no and told Dapolito to place his hands on his head, the first step of the pat down process. Ray's contemporaneous police report never mentioned officer safety as a factor in conducting the pat down, only the need to find identification. But he later testified, as did the other two officers, that the pat down was initiated for officer safety reasons.

When Dapolito did not initially comply, Knight drew his Taser and placed the red dot on the defendant's chest. In response, Dapolito complied with the command to place his hands on his head; his shirt and jacket lifted, and Dyer saw a handgun in the defendant's waistband, which Dyer then grabbed.

Dyer took Dapolito to the county jail. There, the defendant provided the same name and date of birth he had given the officers earlier, as well a social security number. Dispatch searched for the defendant in the Interstate Identification Index, which confirmed his identity[5] and indicated that he was a convicted felon; it did not have any information that Dapolito was wanted for a crime.

II.

---

[5] The post-arrest records Ray reviewed did not contain the middle initial "M" that Dapolito had given when asked in Monument Square. That one-letter discrepancy may have thrown off dispatch's earlier searches to find a matching record. There is no claim that it is not his accurate middle initial.

On March 27, 2012, a federal grand jury indicted Dapolito on one count of being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). The defendant moved to suppress the gun on the ground that the search that resulted in the discovery of the gun derived from an unlawful seizure in violation of the Fourth Amendment. The government argued the encounter was consensual and only became a Terry stop when the defendant was told he was going to be detained. At that point, the government argued, the officers had reasonable suspicion that criminal activity was afoot and the pat-frisk was justified by an objective concern for officer safety.

The district court held an evidentiary hearing on July 18, 2012, hearing testimony from Ray, Knight, and Dyer. It granted the motion to suppress on August 21, 2012. The district court found that the consensual encounter had become a Terry stop by the time Dapolito had produced the EBT card containing the name he had already provided to the officers. Dapolito, 2012 WL 3612602, at *7. The court then determined that at the inception of the Terry stop, the officers lacked reasonable suspicion to permit the detention. The court reasoned that the totality of the circumstances did not provide a particular and objective basis to suspect that the defendant was engaged in a burglary, wanted on an outstanding warrant, or otherwise involved in criminal activity. Id. at *7-8. Rather, "[w]hat the officers had was an odd,

grimacing, impaired man, who was unknown to them and who was not making much sense.  The Defendant was acting not unlike many other members of the indigent and/or transient population of Portland." Id. at *7.

The government's timely appeal followed.

### III.

Under Ornelas v. United States, 517 U.S. 690 (1996), the Courts of Appeals must undertake independent appellate review of a district court's decision on the mixed question of law and fact of whether the historical facts, viewed from the standpoint of an objectively reasonable officer, amount to a reasonable suspicion or to probable cause.  Id. at 696-97.  When reviewing a challenge to a district court's decision on a suppression motion, we review the district court's factual findings and credibility determinations only for clear error.  United States v. Camacho, 661 F.3d 718, 723 (1st Cir. 2011); see Ornelas, 517 U.S. at 699 (findings of historical fact reviewed for clear error).  We review the court's legal conclusions de novo.  United States v. Rabbia, 699 F.3d 85, 89 (1st Cir. 2012).  That being said, it is also true that we "give due weight to inferences drawn from [historical facts] by resident judges and local law enforcement officers."[6]  Ornelas, 517 U.S. at

---

[6] One Supreme Court Justice does not see "how deferring to the District Court's factual inferences (as opposed to its findings of fact) is compatible with de novo review."  United States v. Arvizu, 534 U.S. 266, 278 (2002) (Scalia, J., concurring) (citing Ornelas v. United States, 517 U.S. 690, 705 (1996)).

-10-

699. As explained in United States v. Townsend, 305 F.3d 537 (6th Cir. 2002), the district court, which observes the testimony of the witnesses and understands local conditions, is at an institutional advantage in making this determination. Id. at 542. "Accordingly, 'due weight' should be given to the inferences drawn from the facts by 'resident judges.'" Id. (quoting Ornelas, 517 U.S. at 698).

We wish to be clear about what issues are and are not presented on appeal. The government does not argue that, regardless of reasonable suspicion, the officers independently feared for their safety at the point when they told Dapolito to put his hands on his head, pointed the Taser at him, and placed the red Taser light on his chest. The government accepts the framework that if there was no reasonable suspicion, there was no basis to search Dapolito. The government contends that what began as a consensual stop evolved into a permitted Terry stop because there was reasonable suspicion of criminal activity afoot and it was so at the time of the search.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Amendment prohibits only those searches and seizures that are "unreasonable." United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011). The police may stop and briefly detain an individual for investigative purposes if the police have a reasonable suspicion

-11-

that criminal activity is afoot.  Sokolow, 490 U.S. at 7; Terry, 392 U.S. at 30; Pontoo, 666 F.3d at 27.  An individual is detained when a reasonable person would not feel free to refuse to answer police questions and proceed along his way.[7]  See Florida v. Bostick, 501 U.S. 429, 439 (1991); United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997).

Reasonable suspicion requires there be both a particularized and an objective basis for suspecting the individual stopped of criminal activity.  United States v. Cortez, 449 U.S. 411, 417-18 (1981).  The particularity requirement demands that the finding be "grounded in specific and articulable facts."  United States v. Hensley, 469 U.S. 221, 229 (1985).  The objective requirement dictates that we view the circumstances through the lens of a reasonable police officer.  Pontoo, 666 F.3d at 28.  The reasonable suspicion standard "defies precise definition," and "must be determined case by case."  United States v. Chhien, 266 F.3d 1, 6 (1st Cir. 2001).  It is a commonsense, nontechnical conception.  Ornelas, 517 U.S. at 695.

---

[7] The government challenges the district court's determination of when exactly the detention began.  Whether it began when Dapolito provided the EBT card, as the district court determined, or, as the U.S. says, at the time the defendant was told he would be taken to the county jail, does not control our determination of whether the officers had reasonable suspicion to detain the defendant.  Suffice it to say that Dapolito was detained at least as of the time he was told he was being detained and being taken to jail.  Whatever the relevance of the "fight-or-flight" stance, it occurred later, and was a direct response to that announcement.

In determining whether reasonable suspicion existed, courts must look to the totality of the circumstances. See Cortez, 449 U.S. at 417 ("[T]he essence of all that has been written is that the totality of the circumstances -- the whole picture -- must be taken into account.").  As a result, no individual factor or fact should be considered in isolation. See Arvizu, 534 U.S. at 274-75.

IV.

We deal with the government's three claims of legal error before its challenge to the results of the district court's totality of the circumstances inquiry. First, the U.S. argues that "the court failed to apply the correct test for deciding when the consensual encounter matured into a 'Terry' stop." Second, the U.S. asserts that the court erred in its reasonable suspicion determination because "the court conducted a 'divide-and-conquer' analysis that assessed each fact . . . out of context and assigned those individual facts innocent interpretations." Third, "the lower court[] substitut[ed] . . . its own interpretations of the historical facts for the judgment of two trained and experienced police officers." Recall that the government's rationale for the detention is that there was reasonable suspicion of burglary or that Dapolito was hiding his identity as a wanted fugitive.

As to all three challenges, the district court correctly stated the requirements set by the law, and more particularly set

out in <u>Terry</u>, <u>Arvizu</u>, and <u>Sokolow</u>, and stated that was the law that was being applied.  We go through the <u>Terry</u> issue after discussing the other two.

In <u>Arvizu</u>, 534 U.S. 266, the Supreme Court rejected a "divide-and-conquer" analysis under which the relevance of individual factors are considered in isolation from one another in making a reasonable suspicion determination.  <u>Id.</u> at 274; <u>see</u> <u>also</u> <u>Sokolow</u>, 490 U.S. at 7-8 (finding lower court erred in dividing evidence rather than simply considering the whole picture).  The government argues the district court committed such error here. Not so.

The district court was acutely aware of the totality of the circumstances approach that is required.  The court expressly said that its task was to consider the totality of the circumstances.  <u>Dapolito</u>, 2012 WL 3612602, at *4.  It engaged in careful consideration of all the facts, as its opinion shows.

The government compiles a list of examples it argues are instances of a "divide-and-conquer" analysis, including the district court's consideration of three facts: that the officers were not aware of any burglaries in Monument Square that night or in the past month, that they saw no visible evidence of a burglary or of Dapolito's possession of tools to commit burglary, and that they had no knowledge of an outstanding warrant as to Dapolito.  In

doing so, it is the government that commits the error it accuses the district court of making.

It was both legitimate and reasonable for the court to consider whether, as a factual matter, the area was actually the scene of recent crimes. See, e.g., United States v. Hart, 674 F.3d 33, 39 n.1 (1st Cir. 2012) (character of the area in which defendant was seized is a factual issue best left to the district court). The character and occurrence of crimes in an area is a relevant factor in a totality of the circumstances inquiry. See Schubert v. City of Springfield, 589 F.3d 496, 501-02 (1st Cir. 2009) (reasonable suspicion where officer saw man carrying gun in high-crime area walking toward public building). We have looked at (1) the nexus between the type of crime most prevalent or common in the area and the type of crime suspected in this case; (2) the limited geographic boundaries of the area; and (3) the temporal proximity between the evidence of heightened criminal activity and the date of the stop. See United States v. Wright, 485 F.3d 45, 53-54 (1st Cir. 2007) (collecting cases). The court properly considered the history (or lack thereof) of burglaries in Monument Square during the prior month.

The court also properly considered the presence or absence of the other factors it discussed in its opinion. See, e.g., Hensley, 469 U.S. at 229 (flyer issued by another department indicating person wanted); Rabbia, 699 F.3d at 89-90 (officers

observed drug transaction); <u>Pontoo</u>, 666 F.3d at 28 (responding to report of murder); <u>Camacho</u>, 661 F.3d at 729 (responding to 911 call); <u>United States</u> v. <u>Jones</u>, 432 F.3d 34, 40-42 & n.1 (1st Cir. 2005) (considering as relevant type of gloves defendant was wearing, as useful to conceal fingerprints, and clothing more broadly). The court was not imposing any per se requirements that certain factors had to exist, as the government claims.[8] Moreover, the government's argument essentially seeks to sweep those considerations to the side, which would be a sort of "divide-and-conquer" approach that would isolate only those facts helpful to the government's case. This ground of error fails.

The government also asserts that the district court erred in its "readiness to substitute its own judgment for that of two [experienced] police officers." Again, the district court articulated the correct legal standard, stating that it considered the totality of the circumstances "through the lens of a reasonable

---

[8] The government also presents an argument that the court required the officers to question the data records and the sophistication of the search engine used by dispatch. The district court imposed no such rule, but was explaining that without information about how the dispatch search system operated -- such as how close the name searched must be to the name on file -- the failure of the system to come back with a record provided less weight to any suspicion that Dapolito was giving a false name to avoid detection. <u>Cf.</u> <u>Arizona</u> v. <u>Evans</u>, 514 U.S. 1, 17-18 (1995) (O'Connor, J., concurring) ("In recent years, we have witnessed the advent of powerful, computer-based recordkeeping systems that facilitate arrests in ways that have never before been possible. The police, of course, are entitled to enjoy the substantial advantages this technology confers. They may not, however, rely on it blindly.").

police officer." Dapolito, 2012 WL 3612602, at *8; see Pontoo, 666 F.3d at 28. To the extent the government argues the district court needed to defer to these specific police officers' view of the situation, and cast aside its individual judgment about what an objective officer's view would be, that is not the law.

The government takes issue with the district court's ruling that it "cannot infer that [Dapolito] deliberately misspelled his name to shield his true identity, particularly since, when asked a second time, he spelled his name correctly and he turned over an EBT card in the name of Anthony Dapolito." Dapolito, 2012 WL 3612602, at *8. Since the government has said repeatedly that it is not attacking the factual findings of the district court (and could not show clear error in any event), the purpose of this argument is unclear. The district court did not say that there was no room for an objectively reasonable officer, or even Officer Ray, initially, to wonder about the reasons for the wrong spelling. Rather, the court said only that after the correct spelling was given, and then verified by the EBT card, the fact of the misspelling -- in light of the ambiguity over whether Dapolito, who appeared to be intoxicated or otherwise impaired, accidentally misspelled his name, or the officer misheard what an apparently intoxicated or otherwise impaired man said -- did not permit an objectively reasonable inference that Dapolito had deliberately misspelled the name to hide his identity because he was wanted for

a crime. The district court considered that datum, among the totality of the data -- including the fact that the officers did not know whether the second spelling was correct, and the lack of a photo on the EBT card -- in reaching its conclusion. We see no basis for the government's argument that the court did not use the correct standard.

Ultimately, the government's Terry argument comes down to whether the district court, having correctly articulated and understood the relevant legal standards, nonetheless erred in its reasonable suspicion determination. The appellant, here the government, bears the burden of establishing error. See United States v. Randazzo, 80 F.3d 623, 633 (1st Cir. 1996) ("In all events, it is the appellant's responsibility to make some showing that an error has been committed."); United States v. Mala, 7 F.3d 1058, 1061 (1st Cir. 1993); see also Murphy v. St. Paul Fire & Marine Ins. Co., 314 F.2d 30, 31 (5th Cir. 1963); United States v. Rogers, 120 F.2d 244, 248 (9th Cir. 1941).

The government, at oral argument, provided a list of facts it said, taken together, so established reasonable suspicion of criminal activity that we must reverse. These facts included: the time of night; the recent rash of burglaries in downtown; Dapolito's standing near a closed business and an ATM; his odd behavior; the fact that he gave two different spellings of his name and they could not be verified; his lack of possession of a key to

-18-

the building where he said he lived; and the fact that his cell phone was dead, preventing him from contacting his supposed roommates. Exercising independent review and looking at the totality of the circumstances, we cannot say that the district court committed error.

The district court focused on the officers' suspicions that Dapolito was engaged in or about to be engaged in a burglary and/or that Dapolito was wanted on an outstanding warrant, the only two suspicions of crime the government has offered.[9] The district court's reasoning, which fully supports its conclusion, does not need to be repeated here. We just add a few observations.

The burglary justification offered by the government comes from the fact that the "downtown area" -- a large area covering at least Commercial Street, Fore Street, Exchange Street, and Congress Street -- had experienced some recent commercial burglaries. But there was no evidence that Monument Square was a particular hot spot, or that it had even had any recent burglaries. There was no evidence of ATM burglaries in the area, and there was no evidence as to what was meant by "recent."

Moreover, the defendant's behavior did not tie him to a burglary.[10] There was no evidence that Dapolito was fiddling with

_____

[9] There is no argument that Dapolito was suspected of adding graffiti to buildings.

[10] We pause to distinguish some of the cases which the government says require us to find error, but all of which show a

doorways or even with the ATM in the alcove.  The officers did not

see any tools of the trade, such as pliers or a pry bar, on or near

the defendant that would be used in a burglary.  And, unlike in

---

particularized and objective basis for suspecting the individuals of criminal activity.  We need not address every case, but we highlight just a few.  We found reasonable suspicion in United States v. Walker, 924 F.2d 1 (1st Cir. 1991), where a reasonable officer could conclude from his observations that a burglary was in progress.  There, an officer observed individuals at 2:30 a.m., near a trailer loaded with wood, at a lumber and construction materials business that had seen several recent burglaries.  The officer had never noticed a delivery at that hour in four years of patrolling the area, and the trailer was parked in a concealed manner.  Id. at 4.  There is no attempt here to even argue that the officers had reasonable suspicion of a crime in progress.

This case also differs significantly from United States v. Kimball, 25 F.3d 1 (1st Cir. 1994), where the officer had a reasonable suspicion of a burglary where a vehicle was parked in a school parking lot after midnight, and where a number of schools had been recently robbed.  Id. at 7.  Moreover, the officer recognized the defendant's car and knew the defendant had a criminal history of burglaries.  Id.  The officers here had no such knowledge, and the presence of an apparently intoxicated or otherwise impaired individual in an urban public square at night is not unusual.

Finally, these facts differ materially from those in United States v. Jones, 432 F.3d 34 (1st Cir. 2005), where at 4 a.m., on a rainy winter night, an officer observed two individuals sprinting down a street.  They were wearing hooded sweatshirts tightly wrapped around their heads, disguising themselves, and thin, white latex gloves more suited for concealing fingerprints than for keeping warm.  Id. at 40-42.  The neighborhood in question had also experienced an abnormal number of recent robberies and break-ins. Id. at 41.  In any event, as the Supreme Court has noted, since each case turns on its own facts, resort to precedent may not be helpful.  See Ornelas, 517 U.S. at 698 ("[O]ne determination will seldom be useful 'precedent' for another . . . ." (quoting Illinois v. Gates, 462 U.S. 213, 238 n.11 (1983)) (internal quotation marks omitted)).

<u>Terry</u>, 392 U.S. at 6-7, the officers did not observe any suspicious behavior, like Dapolito casing a building.[11]

Further, Dapolito readily offered his name, his date of birth, that he was from Massachusetts, and when asked, gave the officers the EBT card. When the officers wanted to talk to him, he responded. Not only does this not fit the pattern of someone trying to avoid police attention, but it also does not add credence to the alternative theory that Dapolito was wanted on a warrant.

Unlike a situation where the police have been given information on an individual's wanted status, <u>see</u>, <u>e.g.</u>, <u>Hensley</u>, 469 U.S. at 229 (police had wanted flyer); <u>United States</u> v. <u>Nelson</u>, 483 F. App'x 677, 682 (3d Cir. 2012) (reasonable suspicion where officer knew of outstanding warrant), such information was lacking here. Rather, the officers became suspicious because dispatch could not find Dapolito on record and because Dapolito provided, or

---

[11] These facts are in contrast to other cases of ours. <u>See</u> <u>United States</u> v. <u>Brake</u>, 666 F.3d 800, 804-05 (1st Cir. 2011) (officer stopped two men with temporal and spatial connection to a residence at which a 911 call reported an individual with a handgun); <u>United States</u> v. <u>Pontoo</u>, 666 F.3d 20, 28 (1st Cir. 2011) (report of murder, with other facts, established reasonable suspicion); <u>Jones</u>, 432 F.3d at 40-42 & n.1 (individuals wearing form-fitting gloves, more appropriate for concealing fingerprints than for keeping hands warm, contributed to finding of reasonable suspicion); <u>United States</u> v. <u>Romain</u>, 393 F.3d 63, 72 (1st Cir. 2004) (911 call and suspect's agitation and belligerence resulted in reasonable suspicion); <u>cf.</u> <u>United States</u> v. <u>Spoerke</u>, 568 F.3d 1236, 1249 (11th Cir. 2009) (officer reasonably suspected criminal activity upon observing gloves, goggles, face mask, and flashlight).

at least the officers thought he did, different spellings of his name.

In fact, Dapolito produced a government benefits card from the state where he said he was from, which confirmed his name. That did not, however, cause the police to terminate the encounter, but to escalate it.

As the district court noted, the mere fact that dispatch did not get an affirmative match from whatever government record system it consulted does not, standing alone, create reasonable suspicion of a crime, either the first time, or the second time. A simple mishearing or mistake as to a name, or the use or omission of an initial, may alter results of the search, and the record system itself, even assuming accuracy of input, is only as complete as the systems which feed into it. We do not say that the failure to find a corresponding match is irrelevant, but that it does not carry the weight the government, in this context, gives it. It simply cannot be that reasonable suspicion of a person being a wanted fugitive is created by the failure to find the name, given by a person, in a government database. Ironically, had Dapolito's name been found, the information would not have shown he was wanted on a warrant.

The dissent contends that "the situation was ambiguous" and that a Terry stop was justified even if there was an innocent explanation. But the dissent overstates whatever ambiguity

remained after Dapolito produced the EBT card from Massachusetts, the state with which he claimed an association, in his name, which comported with the name he provided the officers and which was spelled exactly as he spelled it to the officers the second time. By that point, the officers had some corroboration that the defendant had identification in the name that he had provided and, although Dapolito's behavior may still have seemed odd, the officers had a lesser, not a greater, basis to believe that he was being untruthful.

A reasonable person in Dapolito's position would not have felt free to disregard the police and go about his business. See, e.g., United States v. Espinoza, 490 F.3d 41, 49 (1st Cir. 2007). He was told he was being taken to jail, despite his having cooperated and answered the officers' questions. He was told he would be searched despite the fact that he had twice said he did not want to be searched, or even touched. He felt he needed police permission even to step back three steps; and when he asked to do so, he was told no. There were three officers, with a patrol car ready to remove him. Most likely, a reasonable person would not have felt free to leave even earlier than the moment at which Dapolito was told he was being taken to jail, but we need not decide that.

The district court determined the encounter became a Terry stop prior to this point, and the dissent takes issue with

the district court's consideration of the duration of the encounter in making that determination, stating that "the length of a consensual encounter alone" cannot transform the encounter into a <u>Terry</u> stop. But the district court did not rely solely on the length of the encounter to find that a <u>Terry</u> stop occurred. Rather, the district court also considered the intensification and the accusatory nature of the questioning, the statement to Dapolito that he was lying, and the fact that the EBT card did not alleviate the officers' suspicions. See <u>Dapolito</u>, 2012 WL 3612602, at *7 ("While the initial encounter was casual, the interaction intensified after the Defendant had correctly spelled his name and the dispatcher had relayed the information that there was no record found. At that point, Officer Ray's questioning became accusatory, and Officer Ray told the Defendant that he believed the Defendant was lying. After about fifteen minutes of questioning, and after the production of the EBT card did not dispel the officers' suspicions, it would have been obvious to any reasonable person that the police were not going to let him go."). In any event, the officers did not have reasonable suspicion of a crime at the time they told Dapolito they were taking him to the county jail.[12]

---

[12] On these facts, the question also arises as to whether, at that time, this was a de facto arrest. It is a question the district court did not address, nor do we. We do note that, if it was an arrest, we think it clear that there was no probable cause for an arrest, there not being even reasonable suspicion.

-24-

It was certainly reasonable for the officers here to approach Dapolito. They were on patrol in the early morning hours when they encountered a man, unknown to them, who appeared to be intoxicated or otherwise impaired, whose identity they could not readily verify, and whose behavior and facial gestures they could have reasonably viewed as bizarre. Certainly, as a matter of law enforcement and public protection, it was reasonable for them to speak with the defendant to determine if he needed assistance or if criminal activity was afoot. Neither party disputes that the encounter that began between the police and the defendant was consensual and proper. But where, for the reasons we have previously explained, the police did not have reasonable suspicion to believe that the defendant had been or was going to be engaged in a crime, the consensual inquiry (with which Dapolito complied) cannot be converted into an investigatory stop. The law requires this result.

Affirmed.

**-Dissenting Opinion Follows-**

**HOWARD, Circuit Judge, dissenting.** In my view, the government correctly identified three critical errors of law in the district court's order to suppress the handgun found on Dapolito's person. Rather than correct these errors, the panel majority sidesteps the first and repeats the second and third. With great respect, I must dissent from the majority's opinion.

Although it is our practice to defer to the district court's factual findings and review them only for clear error, we are also obligated to perform an "independent appellate review" of the district court's "ultimate determination[] of reasonable suspicion." Ornelas v. United States, 517 U.S. 690, 697 (1996); United States v. Battle, 637 F.3d 44, 48-49 (1st Cir. 2011). The Supreme Court has emphasized the importance of de novo review in cases like this one for at least three reasons. First, if we deferred to the district court's decision on reasonable suspicion-- a mixed question of law and fact--we would permit the scope and force of the Fourth Amendment to vary between identical factual situations, depending on which district judge heard the motion to suppress. See Ornelas, 517 U.S. at 697 (citing Brinegar v. United States, 338 U.S. 160, 171 (1949)). Second, reasonable suspicion is a "commonsense, nontechnical" concept that gains form "only through application," and so de novo review is "necessary if appellate courts are to maintain control of, and to clarify, the legal principles" that define the law in this area. Id. at 695, 697

-26-

(citing <u>Miller</u> v. <u>Fenton</u>, 474 U.S. 104, 114 (1985)). Finally, de novo review serves to unify and rationalize past precedent, so that our Fourth Amendment jurisprudence will "provid[e] law enforcement officers with a defined 'set of rules which, in most instances, makes it possible to reach a correct determination beforehand as to whether an invasion of privacy is justified in the interest of law enforcement.'" <u>Id.</u> at 697-98 (quoting <u>New York</u> v. <u>Belton</u>, 453 U.S. 454, 458 (1981)). Therefore, while we should defer to the district court's description of the historical record, we owe no deference to its view of the law. Instead, we have a duty to apply the law anew.

The first error in the district court's suppression order is its conclusion that a <u>Terry</u> stop occurred at the moment that Dapolito produced his EBT card and still failed to allay the officers' suspicions. <u>United States</u> v. <u>Dapolito</u>, No. 2:12-cr-00045-NT, 2012 WL 3612602 at *7 (D. Me. Aug. 21, 2012). The majority avoids this issue by assuming arguendo that no stop occurred until later, when the officers told Dapolito that they intended to take him to jail in order to identify him. But the majority opinion leaves the actual timing of the stop an open question. <u>See</u> <u>ante</u> at 12 n.7. I believe that we can and should state with confidence that no stop occurred until later, when the officers actually attempted to arrest Dapolito.

Law enforcement agents are free to "approach[] an individual and ask[] [him] a few questions" without implicating any Fourth Amendment protections. Florida v. Bostick, 501 U.S. 429, 434 (1991). Those interactions "need not find a basis in any articulable suspicion." United States v. Young, 105 F.3d 1, 5 (1st Cir. 1997). Only when an encounter escalates into a brief "investigatory stop," also known as a "Terry stop," see Terry v. Ohio, 392 U.S. 1 (1968), does the Fourth Amendment come into play. In such cases, the Fourth Amendment requires that the police have "a reasonable suspicion that criminal activity may be afoot." United States v. Pontoo, 666 F.3d 20, 27 (1st Cir. 2011). The Supreme Court has identified the moment at which a consensual encounter transforms into Terry stop as when "a reasonable person would . . . believe[] that he [is] not free to leave," I.N.S. v. Delgado, 466 U.S. 210, 215 (1984) (quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980)), and we use a totality of the circumstances inquiry to conduct that analysis, United States v. Smith, 423 F.3d 25, 29-30 (1st Cir. 2005)

In this case, the district court found that the interaction between Dapolito and the police began as a consensual encounter but matured into a Terry stop "[a]fter about fifteen minutes of questioning, and after the production of the EBT card did not dispel the officers' suspicions." Dapolito, 2012 WL 3612602, at *7. At that point, according to the district court,

-28-

"it would have been obvious to any reasonable person that the police were not going to let him go." Id.

I find that conclusion difficult to square with the settled law in this area. The district court's opinion does not explain why or how the length of the encounter and the officers' incredulity communicated to Dapolito that he was suddenly not allowed to walk away. According to the Supreme Court, circumstances that may indicate a Terry stop include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." Mendenhall, 446 U.S. at 554. Here, if no Terry stop had occurred before the production of the EBT card--and, in fact, up to that moment only two officers were present, they had not drawn their weapons or touched Dapolito, and they did nothing to indicate that Dapolito was compelled to comply with their requests--then it remains a mystery to me how the encounter became a Terry stop after that point.

The district court's order emphasizes that Dapolito was physically confined because "his egress was impaired" by the position of the two officers in front of the alcove. Dapolito, 2012 WL 3612602, at *7. However, we have urged courts to "remember[] that mere physical limitations on an individual's

movement, not created by police, are insufficient to turn an encounter with police into a restraint of liberty." Smith, 423 F.3d at 30. That adage follows the lead of the Supreme Court, which has repeatedly declined to find a seizure when law enforcement agents block a civilian's escape from a confined space. See Bostick, 501 U.S. at 436; see also Delgado, 466 U.S. at 218-19. Here, the officers "stood where they had to," Smith, 423 F.3d at 30, and the fact that they had to stand at the opening of the alcove did not mean that they had seized Dapolito for Fourth Amendment purposes.

Nor did the length of the exchange up to that point, which the district court clocked at approximately 15 minutes, see Dapolito, 2012 WL 3612602, at *7, transform the encounter into a Terry stop. A totality of the circumstances analysis logically includes the duration of the encounter,[13] but we have emphasized that the "trigger point for Fourth Amendment purposes is the presence or absence of some cognizable coercion or constraint," United States v. Espinoza, 490 F.3d 41, 48 (1st Cir. 2007) (emphasis added). That formulation belies the notion that the length of a consensual encounter alone can transform it into a Terry stop. Indeed, we rejected exactly that proposition in United

_____

[13]Cf. United States v. Woodrum, 202 F.3d 1, 8 (1st Cir. 2000) ("[W]hen an encounter takes some appreciable time . . . the justification for the detention becomes an issue because the individual may no longer understand his participation to be voluntary.").

-30-

States v. Berryman, 717 F.2d 650 (1st Cir. 1983) (en banc), in which our circuit sitting en banc reversed a prior decision by a panel majority that had held that the "prolongation" of police questioning could create "an atmosphere of restraint" that would constitute a Terry stop.[14] United States v. Berryman, 717 F.2d 651, 656 (1st Cir.), rev'd en banc, 717 F.2d 650 (1st Cir. 1983); see also United States v. Gallego-Zapata, 630 F. Supp. 665, 670 (D. Mass. 1986). Regardless, in my view, the 15 minutes of questioning in this case was not so long that it escalated into a Terry stop-- we have previously found that a consensual encounter lasting over 20 minutes did not amount to a restriction on liberty implicating the Fourth Amendment. See, e.g., United States v. Jodoin, 672 F.2d 232, 234 (1st Cir. 1982), abrogated on other grounds, Bloate v. United States, 559 U.S. 196 (2010).

In any event, what should be practically decisive in this case is the fact that Dapolito apparently felt comfortable enough throughout the encounter that he repeatedly declined the officers' requests to search him for identification. See Dapolito, 2012 WL 3612602, at *2 ("Officer Ray . . . asked if he could pat [Dapolito] down to find identification. [Dapolito] refused, telling the officers that he did not like to be touched."); id. ("Officer Ray

---

[14]Then-Judge Breyer dissented from this conclusion in the original Berryman opinion, see Berryman, 717 F.2d at 663 (Breyer, J., dissenting), and his position was vindicated by the subsequent en banc decision.

asked a second time if he could search [Dapolito] for identification. [Dapolito] again refused."); see also id. at *3 ("Officer Ray told [Dapolito] that they were taking him to the county jail to identify him . . . [Dapolito] turned slightly away from the officers and said that he 'didn't want that.'"). When the suspect's freedom of movement is restricted by factors independent of police conduct, the Supreme Court has instructed that we should modify the traditional "free to leave" inquiry and instead ask "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." Bostick, 501 U.S. at 439 (emphasis added). Here, Dapolito obviously felt that freedom and exercised it more than once. Indeed, he rebuffed a request by the officers to search him just moments before he produced the EBT card--the point at which the district court concluded that a Terry stop took place. Although the majority steers around the issue, the law makes clear that no Terry stop had occurred at the time identified by the district court.

Were I writing the majority opinion, I would stop here, reverse the district court on this issue, and remand the case for further proceedings. If there was no Terry stop at the moment chosen by the district court, then the police were not required to have reasonable suspicion to engage with Dapolito at that point. On remand, the district court would then study the remaining chronology for any subsequent Fourth Amendment violations.

However, because the majority assumes arguendo that no Terry stop occurred until the police actually attempted to arrest Dapolito, its analysis continues onward. The majority observes that there is a serious question as to whether the detention at this later moment was merely a Terry stop or if it actually constituted a de facto arrest, ante at 24 n.12, a greater intrusion that would have required the correspondingly greater justification of "probable cause." See Young, 105 F.3d at 6. Nevertheless, the majority concludes that it need not answer this question because the officers did not even meet the lower requirement of reasonable suspicion needed to justify a Terry stop.

Although I expect that the government would find itself quite far from the end zone on the de facto arrest issue if the case were remanded, I am compelled to state my disagreement with the majority's conclusion that the officers did not at least have a reasonable suspicion of criminal activity that would have justified a Terry stop. That discussion also brings me to the government's second and third claims of error, addressed to the district court's finding that no reasonable suspicion existed to support the brief detention of Dapolito. I believe that the government correctly identified two important mistakes, and that the majority reinscribes these errors in its own analysis. I also believe that both opinions reach the wrong outcome on the overall

issue, since our precedent makes clear that the officers had reasonable suspicion to execute a <u>Terry</u> stop in this case.

I am persuaded by the government's argument that the order to suppress commits a second error when it engages in an impermissible "divide-and-conquer" analysis of the facts surrounding the encounter with Dapolito. <u>United States</u> v. <u>Arvizu</u>, 534 U.S. 266, 274 (2002); <u>see also</u> <u>Pontoo</u>, 666 F.3d at 29. We use a totality of the circumstances test to determine whether reasonable suspicion existed to justify a <u>Terry</u> stop. This analysis requires a "broad-based consideration of all the attendant circumstances," <u>United States</u> v. <u>Chhien</u>, 266 F.3d 1, 6 (1st Cir. 2001), so that "the whole picture . . . [is] taken into account," <u>United States</u> v. <u>Cortez</u>, 449 U.S. 411, 417 (1981). It precludes courts from dismantling a claim of reasonable suspicion by picking out the suspicious factors one-by-one and offering an innocent explanation for each. <u>United States</u> v. <u>McGregor</u>, 650 F.3d 813, 822 (1st Cir. 2011).

Yet that is exactly what happened here. The suppression order repeatedly excuses Dapolito's behavior merely because it was lawful, but never considers how his weird manner could still have seemed suspicious to the police in context. <u>See, e.g.,</u> <u>Dapolito</u>, 2012 WL 3612602, at *7 ("What the officers had was an odd, grimacing, impaired man, who was unknown to them and who was not making much sense. [Dapolito] was acting not unlike many other

-34-

members of the indigent and/or transient population of Portland.");
id. at *8 ("[Dapolito's] story . . . was not adding up, but . . .
[e]ven if the story was not truthful, the Government made no claim
that such a false statement would be criminal.").  That reasoning
is directly contrary to the Supreme Court's clear instruction that
"[a] determination that reasonable suspicion exists . . . need not
rule out the possibility of innocent conduct."  Arvizu, 534 U.S. at
277; see also Pontoo, 666 F.3d at 29.

An even more critical mistake, in my view, is that the
court's suppression order isolates and dismisses each of the two
crimes that the police officers suspected Dapolito of committing,
without considering the totality of the circumstances from an
objective point of view.  During the encounter with Dapolito, the
officers on the scene suspected either that he may have been
involved in a burglary or that he might be wanted on a warrant.
See Dapolito, 2012 WL 3612602, at *7.  We are bound to consider
these two possibilities together, rather than "in splendid
isolation."  Pontoo, 666 F.3d at 29.  Nor are we limited only to
these two possibilities, since "[w]hether a reasonable suspicion
exists is treated as an objective inquiry: the actual motive or
thought process of the officer is not plumbed."  Bolton v. Taylor,
367 F.3d 5, 7 (1st Cir. 2004).  Although neither the burglary nor
the warrant theory was invincible on its own, we must consider them
both along with all of the other possible crimes that an objective

-35-

view of the circumstances would have given the police reason to suspect--for instance, that Dapolito was in possession of a controlled substance or that he was planning to rob the next person who exited or entered the apartment building. Viewed through this holistic lens, a reasonable law enforcement agent at the scene would have had good reason to believe that "criminal activity may be afoot." Arvizu, 534 U.S. at 273 (internal quotation marks omitted).

The third error in the order to suppress is that the district court substitutes its own judgment for that of the officers on the scene. We use "an objective inquiry . . . from the perspective of the searching officers" to evaluate whether a Terry stop was justified by reasonable suspicion. United States v. Aitoro, 446 F.3d 246, 253 (1st Cir. 2006). In order to adopt the perspective of an objectively reasonable officer, we must remember that law enforcement "is not required to possess the clarity of vision that arises only in hindsight." Pontoo, 666 F.3d at 28.

When the district court discusses how Dapolito misspelled his name, however, it substitutes its own after-the-fact perspective for what would have been apparent to the police officers on the scene. Viewing the scene through the eyes of the officers, we see a man who claims to have a Massachusetts driver's license, but who gives a name that does not appear in either the Massachusetts or Maine motor vehicle records. See Dapolito, 2012

WL 3612602, at *2.  Asked again for his name, the man spells it differently from the first time he offered it, and yet even this new spelling does not appear in either state's database.  See id. Finally, we spot an EBT card in the man's pocket, which when produced bears the name that the man gave the second time but includes no other identifying information.  See id.  These facts are all that the police could have known, and yet the order to suppress downplays the officers' suspicions on the grounds that Dapolito spelled his name "correctly" the second time, id., and that "it is more likely that [Dapolito] either unintentionally misspelled his name the first time or that [the officers] misheard him."  Id. at *8.  Of course, while these facts were apparent to the district court sub specie aeternitatis, they would hardly have been evident to a cop on the beat.  We must take the latter perspective when we evaluate whether the police acted reasonably.

Because I differ from the panel majority on how we should evaluate the facts of this case, I also reach a different outcome in my reasonable suspicion analysis.  The way I see it, the police encountered Dapolito, a grimacing, apparently intoxicated, and nervous-looking man, standing alone outside at 2:39 AM in the morning, in an area where burglaries had recently occurred.  He was stationed in an alcove alongside an ATM machine, waiting without any clear purpose in front of the doors to a restaurant and an apartment building.  His mannerisms were weird, and much of what he

said made no sense.  He told the police that his name was "Daplito" and claimed that he had a Massachusetts driver's license--he could not produce one--yet when the police searched both the Massachusetts and Maine motor vehicle databases, no such name appeared.  Asked again for his name, he spelled it differently, as "Dapolito," but again, no name turned up in the motor vehicle records.  At the officers' prodding, the man pulled an EBT card from his pocket that bore one of the names that he had given but did not have any other identifying information.  The man said he lived in the apartment building behind him, but he did not have keys to the building, nor did he have a cell phone with which he could contact his roommates.  When the officers pushed the buzzer to ring the apartment number where the man claimed to live, no one responded.

Certainly, the situation was ambiguous. But "the Supreme Court has stressed that a Terry stop is permitted even if 'the conduct justifying the stop was ambiguous and susceptible of an innocent explanation.'" United States v. Wright, 582 F.3d 199, 213 (1st Cir. 2009) (quoting Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).  In fact, "the very purpose of [a Terry stop] is to clarify ambiguous situations."  Id. (quoting 2 LaFave et al., Criminal Procedure § 3.8(d), at 327 (3d ed. 2007)).  And although there was nothing directly linking Dapolito to criminal conduct, "no direct link between the suspect and the suspected criminal

activity need be forged in order to achieve reasonable suspicion." Ruidiaz, 529 F.3d at 29; see also Chhien, 266 F.3d at 6.

What matters here is that there was concrete cause for concern, given that Dapolito was standing by himself at a late hour in an area where there had been recent burglaries, obviously impaired, outside an apartment building where he claimed to live and yet could not access, and unable to give a straight answer on his own name. He may have been preparing to break into the building or the nearby ATM, or perhaps he was lying in wait to mug the next person who tried to enter the apartment building, or maybe he was under the influence of a controlled substance. Then again, he may just have been, as the district court suggested, one of the "many . . . members of the indigent and/or transient population of Portland." Dapolito, 2012 WL 3612602, at *7. The point is that officers needed to briefly detain Dapolito in order to find out. Even if it was more likely than not that Dapolito was merely a harmless transient, reasonable suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence . . . [or] probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989). The officers had a reasonable suspicion here.

Like the majority, I find that the fact patterns presented in Terry stop cases are so "multifaceted" that "one determination will seldom be a useful precedent for another." Ornelas, 517 U.S. at 698 (internal quotation marks omitted). But

I feel obligated to cite just a few of our past decisions that presented similar fact patterns, which I believe demonstrate that the bar for reasonable suspicion has been met in this case. In Foley v. Kiely, 602 F.3d 28 (1st Cir. 2010), we found that the police had reasonable suspicion to conduct a Terry stop of a man whom they encountered in a park late at night, possibly after the park had closed, in an area where crimes had been reported. Id. at 32. In United States v. Walker, 924 F.2d 1 (1st Cir. 1991), we held that a Terry stop was justified when, at 2:30 AM, the officers spotted two people in the dimly lit parking lot of a lumber and construction business, standing near a trailer rig loaded with wood and a detached cab, in an area where there had been burglaries in the past. Id. at 4. Finally, in United States v. Jones, 432 F.3d 34 (1st Cir. 2005), we concluded that there was reasonable suspicion for a Terry stop when the police saw two men sprinting down the street at 4:00 AM, wearing hooded sweatshirts and strange white gloves, in a neighborhood where there had been a number of robberies and break-ins, and where a third man was walking ahead of them in the same direction. Id. at 41. The facts of these cases do not perfectly align with the ones at hand, but in my opinion, they support a finding of reasonable suspicion in this case.

I respectfully dissent.