# United States Court of Appeals
## For the First Circuit

No. 04-1606

UNITED STATES,

Appellee,

v.

KHARY JONES,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Richard G. Stearns, U.S. District Judge]

Before

Lynch, Circuit Judge,

Campbell and Stahl, Senior Circuit Judges.

Mark W. Shea, with whom Shea, LaRocque & Wood LLP was on brief, for appellant.
Cynthia A. Young, Assistant U.S. Attorney, with whom Michael J. Sullivan, United States Attorney, was on brief, for appellee.

December 19, 2005

**CAMPBELL**, **Senior Circuit Judge**.   Appellant-defendant Khary Jones appeals from his conviction and sentence in the United States District Court for the District of Massachusetts.   Jones entered a conditional guilty plea to one count of carjacking, in violation of 18 U.S.C. § 2119, and one count of using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c).   On appeal, Jones makes two arguments:   first, that the district court erred in denying his motion to suppress certain evidence, and second, that his case should be remanded for resentencing in the district court pursuant to United States v. Booker, 125 S. Ct. 738 (2005).   We now affirm the district court's judgment and sentence.

### I.   Background

The facts of the case, largely undisputed, are set out in United States v. Jones, 261 F. Supp. 2d 40 (D. Mass. 2003).   The most relevant facts are as follows:

On the cold and rainy night of March 19, 2002, at about 4:00 a.m., Boston Police Officers Christopher Broderick and Richard Moriarty were patrolling in their cruiser in Boston's South End. In the weeks prior to this night, there had been an abnormally large number of armed robberies and car break-ins in the area.   The two officers had not received any reports of a specific crime that evening.   As they drove toward Appleton Street, they saw on their left two men running nearly side-by-side along Appleton and across

Clarendon.  The men were wearing sweatshirts with hoods drawn tightly around their heads and what initially appeared to the officers to be white cotton gloves.  The officers were unsure of what the men were doing but considered it to be of an "unlawful design."  They sped up the cruiser and turned right onto Appleton Street, where Moriarty got out of the car and approached one of the hooded men.  Moriarty told the man, later identified as the defendant, to stop, which Jones did immediately, throwing his hands up in the air.  At that point, Moriarty observed that Jones' gloves were of white latex.  Asked why he wore them, Jones said his hands were cold.  Asked if he had any weapons on him, Jones said that he had a knife, which Moriarty confiscated.

Meanwhile, Broderick drove further down Appleton Street, parked, and got out of the cruiser.  The second hooded man, later identified as Samuel Whiteside, had continued to run down the sidewalk.  He turned left between two cars, right onto the sidewalk, and ran until he was under a lit lamppost, where he bent down so that Broderick could see only the top of his head. Whiteside then straightened into full view and continued to run down the sidewalk as Broderick chased him and asked him several times to stop.  At this point, Broderick saw a third man, later identified as Darrell Weaver, walking on the sidewalk in the same direction that Jones and Whiteside had been running.  While this was Broderick's first view of Weaver, Broderick testified that his

partner, Moriarty, had told him he saw Weaver when the cruiser first turned onto Appleton Street. Moriarty was unable to testify at the suppression hearing because he was serving in Iraq. The district judge found that Moriarty saw Weaver before the officers got out of the cruiser and that Whiteside and Jones appeared to be chasing Weaver.

After Broderick saw Weaver walking ahead on the sidewalk, Whiteside ran towards Weaver but slowed to a walk as he approached him. Broderick caught up to the two men, who sat down on the steps of 84 Appleton Street. When Broderick asked what they were doing, Whiteside replied that he was "just walking with my boy." Weaver looked back and forth between Whiteside and Broderick and appeared confused. Broderick took both men back to the cruiser and questioned them individually while Moriarty talked to Jones.

The officers concluded that Weaver was not with Whiteside and Jones and let him go. Broderick asked Whiteside why he was wearing a latex glove, and Whiteside responded that he was wearing one glove because a cut on his hand had become infected. Moriarty then walked back in the direction in which he had seen Whiteside run and found, where Broderick had seen Whiteside pause and bend down earlier, a .32 caliber semi-automatic handgun with a chambered live round and a one-dollar bill sitting on top of a large white trash bag on the sidewalk. The gun was still warm and dry. Moriarty then signaled to Broderick that Jones and Whiteside should

-4-

be handcuffed. The officers asked the two men if they had a license to carry a firearm, and neither man indicated he did.

The officers then arrested Jones and Whiteside and took them to the jail. A booking officer booked the two men, filled out a prisoner booking form which listed Jones' property, including a set of keys, and took booking photos. The arrest booking form indicated that the two men were arrested for "intent to rob while armed." Later, the state initially charged Jones with possession of a firearm without a license, attempted armed robbery, and a moving violation.

The evening before Jones was arrested, on March 18, 2002 at about 12:15 a.m., a seemingly unrelated incident had occurred. Toni Harrison and Ramona Powell were forced out of a car at gunpoint by a young African-American man with braided hair. The two women yelled for the driver of the car, Thomas Edwards, who was across the street, and he ran towards the car as it drove away, getting a side view of the suspect.

On March 23, 2002, Harrison, Edwards, and Edwards' mother Hilda, the owner of the car, went to the police station to review photographs with Boston Police Detective Paul MacIsaac. MacIsaac first spoke to Harrison and gathered a description of the suspect in order to narrow the pool of suspects displayed on the police department's computerized identification imaging system. The result was seventy-eight young African-American men with braided

-5-

hair.  Harrison viewed all the photos and rejected all of them. MacIsaac then changed the search criteria to search for "afro" instead of "braids."  There were ninety-one matches, and Harrison rejected the first seventy-nine.  At the sight of the eightieth photo, however, she jumped back and said, "I think that's him.  I think that's him," and began to cry.  She told MacIsaac that she was eighty-five percent sure it was the suspect.

On March 25, 2002, MacIsaac printed out the photo Harrison had identified, a 1998 booking photo of Khary Jones.  A criminal records check revealed a more recent photo of Jones from his March 19, 2002 arrest.  Using the computer system, MacIsaac then created a nine-photo array, including the March 19 photo. Harrison quickly identified Jones in the new photo array.  Edwards, who had had a side view of the suspect, was unable to identify Jones and instead picked another photo.  Powell "went right to" Jones' picture and said "that's him."

Based on the identifications by Harrison and Powell, MacIsaac obtained and executed a search warrant for Jones relative to the carjacking.  He told Moriarty to look in the area of Jones' March 19 arrest for the stolen car.  The car was found a couple of blocks away from Appleton and Clarendon Streets.  MacIsaac examined Jones' booking sheet, which listed "a key" among his property. MacIsaac obtained a search warrant, executed it, and seized a set of keys, including Edwards' car key.

Indicted on one count of carjacking and one count of possessing a firearm during and in relation to a crime of violence in connection with the March 18, 2002 carjacking, Jones moved to suppress any and all evidence seized from him and/or his possession as a result of the warrantless stop and arrest on March 19, 2002 and the subsequent warrant-based search of his property in jail on April 6, 2002. Jones argued that the officers had not had reasonable suspicion to stop him and Whiteside, nor had they had probable cause to arrest Jones after the discovery of the gun on top of the garbage bag. The district court denied the motion to suppress, finding that the officers had had reasonable suspicion to stop Jones, but assuming arguendo that the stop was illegal, the discovery of the evidence was sufficiently attenuated from the stop to dissipate the taint. Alternatively, the court observed, the independent source doctrine provided a separate basis for the seizure of the keys because MacIsaac, separate from Broderick and Moriarty, had learned the potential significance of the keys during his own investigation.

After the denial of the motion to suppress, Jones entered a conditional guilty plea and was sentenced on April 20, 2004. The district court sentenced Jones to consecutive terms of 30 months' imprisonment on Count 1 and 84 months' imprisonment, the mandatory minimum, on Count 2. This appeal followed.

## II. Discussion

### A. The Motion to Suppress

On appeal, Jones argues that on March 19, 2002, the police officers had neither reasonable suspicion to stop him and Whiteside nor probable cause to arrest them. Further, he argues, MacIsaac's discovery of the keys was not sufficiently removed from the illegal arrest to dissipate the taint, nor was it an independent discovery. Because we find that the initial stop and subsequent arrest were both legal, we do not reach the issues of dissipation of the taint or independent discovery. As Jones himself recognized in his brief, if the arrest was legal, the search of his possessions at the jail was constitutional. We affirm the defendant's conviction.

In reviewing a denial of a motion to suppress, we review questions of law <u>de</u> <u>novo</u> and factual findings for clear error. <u>United States</u> v. <u>Khounsavanh</u>, 113 F.3d 279, 282 (1st Cir. 1997).

### 1. Disputed Finding of Fact

The only factual finding by the district court that Jones seems to contest is that Moriarty had seen from his cruiser the two men chasing Weaver down the street. "A clear error exists only if, after considering all of the evidence, we are left with a definite and firm conviction that a mistake has been made." <u>United States</u> v. <u>McCarthy</u>, 77 F.3d 522, 529 (1st Cir.), <u>cert.</u> <u>denied</u>, 519 U.S. 991 (1996). "'[W]here there is more than one plausible view of the

circumstances, the...court's choice among supportable alternatives cannot be clearly erroneous.'" United States v. Tejada-Beltran, 50 F.3d 105, 110 (1st Cir. 1995) (quoting United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990)). The district court's finding that Moriarty, while still in the car, saw Weaver being chased by Jones and Whiteside is supported by Broderick's hearsay testimony that Moriarty had told him he had seen Weaver ahead of the two men in the direction in which they were running when the cruiser first turned onto Appleton Street. Because that testimony had been given at a suppression hearing, where the Federal Rules of Evidence do not apply in all their rigor, the court overruled the defendant's hearsay objection, and no appeal is specifically made from that ruling, although Jones insists that Weaver was seen only later, by Broderick, after the cruiser stopped and the officers split up. United States v. Schaefer, 87 F.3d 562, 570 (1st Cir. 1996); see also United States v. Bunnell, 280 F.3d 46, 49 (1st Cir. 2002). In any event, the court's finding based on Broderick's testimony of what Moriarty told him is not clearly erroneous.

### 2. Reasonable Suspicion

Police officers may conduct a brief investigatory stop of a suspect if they have reasonable suspicion, based on articulable facts, that a crime is about to be or has been committed. Terry v. Ohio, 392 U.S. 1, 30 (1968); United States v. Golab, 325 F.3d 63, 66 (1st Cir. 2003). Determining whether a reasonable suspicion

exists requires an objective inquiry.  Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004).  An "inchoate and unparticularized suspicion or 'hunch'" of criminal activity is insufficient.  Terry, 392 U.S. at 27.  Reasonable suspicion is evaluated in the context of the totality of the circumstances and demands a "practical, commonsense approach."  United States v. Sowers, 136 F.3d 24, 28 (1st Cir. 1998).

We must determine whether the officers' actions in stopping Jones, after seeing him and his companion running down the street, were justified at their inception and whether the actions taken were "reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop."  United States v. Maguire, 359 F.3d 71, 76 (1st Cir. 2004) (internal quotation omitted).  An officer may draw on his "own experience and specialized training to make inferences from and deductions about the cumulative information . . . that might well elude an untrained person."  United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations and internal quotation omitted).

We hold the stop was justified.  Broderick and Moriarty saw two men sprinting down Appleton Street on a dark, rainy night at 4:00 a.m. wearing hooded sweatshirts tightly wound around their heads and wearing light, white gloves of a type that would seem

inappropriate as protection against the cold weather.[1]  There had been an abnormal number of robberies and break-ins around the neighborhood.  Moriarty spied from the cruiser a third man, Weaver, walking ahead of the two men in the same direction in which they were sprinting.  Jones argues that it was natural for the two men, on a rainy night, to be wearing hoods and to be sprinting in order to escape the rain.  He further notes that "While [reports of crime in the area] may put officers on their guard, they cannot alone justify a stop.  Were the law otherwise, any person who happened to wander into a high-crime area late at night, in the immediate aftermath of a serious crime, could be detained." United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) (citation omitted).  But reports of crime in the area was not the sole fact here warranting suspicion of criminal activity.  There were other facts that, taken in context, were suspicious.  The wearing of hooded sweatshirts tightly wrapped around their heads, while conceivably protecting against the weather, also suggested an intent to disguise the two men's identities.  That they wore gloves of a type less suited to keeping out the cold than concealing fingerprints pointed towards

---

[1]Officer Broderick described the gloves as follows when questioned by the government: "Q: Now these particular gloves--and were they unusual at all to you?  A: Yes.  Q: Why were they unusual?  A: To me winter gloves are, they're big, puffy gloves that keep your hands warm.  They're not form-fitting, tight gloves that don't look like they provide warmth.  Q: And what did these gloves look like?  A: The tight, form-fitting gloves that wouldn't provide warmth.  Like I said, that we use for funeral details."

-11-

a criminal design. The men were sprinting, and given the third person walking ahead, might have been planning to catch up to and rob him. It was dark; the time and conditions favored the commission without detection of crimes like street robbery, car theft, burglary and the like. Taking these factors all together, the totality of the circumstances created an articulable, reasonable suspicion of criminal activity, and thus the stopping of Jones and his companion was within the officers' authority.

### 3. **Probable Cause to Arrest**

Even if a brief investigatory stop were legitimate, Jones argues that the officers lacked probable cause to arrest him after Moriarty had discovered the gun on top of the trash bag. "Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997). The inquiry into probable cause focuses on what the officer knew at the time of the arrest, United States v. Brown, 169 F.3d 89, 91 (1st Cir. 1999), and should evaluate the totality of the circumstances. United States v. Reyes, 225 F.3d 71, 75 (1st Cir. 2000). As the Supreme Court has recently reiterated, however, the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided

-12-

probable cause to arrest.  Devenpeck v. Alford, 125 S.Ct. 588, 594 (2004).  Thus it is irrelevant that the booking officer cited Jones for "intent to rob while armed."  If, on the facts known to the arresting officers, there was probable cause to believe he was committing another crime, the arrest was valid.

The government argues that the police officers had enough information at the time of the arrest to have probable cause to believe that Jones as well as Whiteside knowingly possessed a firearm without a license, in violation of state law, to wit M.G.L. c. 269, § 10.  Jones responds, however, that it was his companion, Whiteside, who possessed the gun.  Officer Moriarty found the discarded weapon in the vicinity where Broderick had earlier seen Whiteside stop and bend down.  Jones himself had had no firearm when earlier stopped, nor did he advance down the street to the place where the gun was eventually recovered.  Without evidence he actively possessed the gun after the officers arrived on the scene, Jones contends the police lacked probable cause to arrest him for possessing it without a license.

But while Jones did not actually possess the gun at the time the officers apprehended him, the surrounding circumstances afforded probable cause to believe he had constructive possession of it.  This was enough to violate the Massachusetts illegal possession statute.  See, e.g., Commonwealth v. Sann Than, 59 Mass. App. Ct. 410, 413, 796 N.E.2d 419, 422 (2003) (instructions on

-13-

constructive possession in a charge under M.G.L. c. 269, § 10).
Cf. Commonwealth v. Moore, 54 Mass. App. Ct. 334, 343, 765 N.E.2d
268, 275 (2002) (related statute, M.G.L. c. 269, § 11C, makes no
distinction between constructive and actual possession for purposes
of presumption that possession of firearm with obliterated serial
number is prima facie evidence of violation of the section).  Under
Massachusetts law, constructive possession implies "knowledge
coupled with the ability and intention to exercise dominion and
control."  Commonwealth v. Garcia, 409 Mass. 675, 686, 569 N.E. 2d
385, 392 (1991) (internal quotations omitted).  Mere presence at
the scene of criminal activity is not sufficient.  United States v.
Pardo, 636 F.2d 535, 549 (D.C. Cir. 1980).  Close proximity to the
firearm, however, so as to be able "to pick it up at any time,"
suffices to establish the power (or "ability") component.  United
States v. McLean, 409 F.3d 492, 504 (1st Cir. 2003).

        In the present case, Whiteside's possession of a live
gun, together with the many other facts implying that Jones and
Whiteside when stopped were engaged together in joint criminal
activity, provided probable cause to infer Jones' constructive
ownership of the live weapon.  The two men were seen by the
officers in one another's company racing down the street, under
circumstances suggesting an intent to rob a man seen walking ahead.
Both were muffled in their hooded sweatshirts; Jones was found to
be wearing latex gloves, while Whiteside wore one latex glove.

-14-

Latex gloves offer little if any protection against the weather. They most obviously would serve the function of preventing fingerprints from being left on items like the gun itself or other objects encountered while engaged in criminal activity. Wearing such gloves was thus a gesture suggesting an intention to exercise dominion and control over the gun as well as to engage in other prospective criminal conduct. The fact that Jones wore two gloves and Whiteside only one suggests that if the gun were to be used, it would be passed to Jones to handle it. When the police cruiser stopped and apprehended Jones, Whiteside kept running and attempted to dispose of the gun for which neither man had a license. The totality of these circumstances gave rise to a reasonable inference that the two men were partners in crime, and that the firearm, with its chambered round, was integral to their joint venture.[2]

We do not imply that the above evidence would necessarily suffice to sustain a finding that Jones was guilty beyond a reasonable doubt of the gun possession charge. Probable cause, however, does not require "evidence sufficient to convict the individual, but merely enough to warrant a reasonable belief that

---

[2]Objectively viewed, these same facts might have also provided probable cause to arrest the two men for attempted armed assault with intent to rob, i.e., the "intent to rob while armed" offense for which they were booked following arrest. While later investigation appears to have led to a decision not to prosecute Jones for attempting to rob Weaver, the facts at the time of the arrest were not inconsistent with this hypothesis. We do not decide this question as the government did not pursue this theory on appeal.

he was engaging in criminal activity." United States v. Link, 238 F.3d 106, 110 (1st Cir. 2001) (citation omitted).  Here, the gun, with a live round in the chamber, was actively possessed by one of the two closely associated men; there was compelling evidence, most notably the latex gloves, as well as the firearm itself, that both men had the intention to use the weapon in their joint criminal enterprise; and both men acknowledged to the officers that they were without licenses to carry a gun.  In the circumstances, we think it was objectively reasonable to infer that both men knew about the gun.  It was also reasonable to infer -- the two men being nearly side-by-side when first seen running down the street -- that the gun was readily transferable from one to the other, providing Jones with the ability to possess it, and that each intended to be able to use the weapon as needed.  That Whiteside may have been carrying the weapon at the time the officers intervened does not rule out Jones' constructive possession: "possession can be joint."  See McLean, 409 F.3d at 504.  While Whiteside appears to have had actual possession when the officers came on the scene, the surrounding circumstances reasonably implied probable cause to attribute constructive possession to his companion, Jones.

### 4.  Attenuation and Independent Means

As noted above, because we find that the police officers had reasonable suspicion to stop Jones and probable cause to arrest

-16-

him, we do not reach the alternate ground of the district court that, even if the stop and arrest had been illegal, the discovery of the evidence was legitimate because of dissipation of the taint or the independent discovery doctrine.

## B. Booker Claim

Prior to his sentencing hearing, Jones moved for a downward departure on the grounds of diminished mental capacity pursuant to U.S.S.G. § 5K2.13 and extraordinary mental and emotional condition pursuant to U.S.S.G. § 5H1.3.

To support his claim of diminished mental capacity, Jones submitted a brief family history and the expert testimony of a forensic psychologist, Dr. Eric Mart, who concluded that Jones was mildly retarded and had "problems with attention and executive functioning...which are areas of deficiency above and beyond his generally low IQ."

Section 5H1.3 provides that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range, except as provided in [§ 5K2.13]." § 5K2.13 provides that:

> A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110 or 117, of Title 18, United States Code.

Noting the limitation "ordinarily" in § 5H1.3, Jones argued that his was an extraordinary case warranting departure even if it did not fit the § 5K2.13 exception because of his "significant intellectual and information processing deficiencies" and because his mental condition was "outside the norm." The government opposed the motion on the grounds that a § 5K2.13 departure was unavailable since Jones had committed a crime of violence. Moreover, the government argued, Jones' case was not so extraordinary as to warrant the departure even if the "ordinarily" language could be deemed to provide some degree of "wiggle room." See United States v. Pullen, 89 F.3d 368, 370 (7th Cir. 1996).

The district court concluded that a departure under § 5K2.13 was not available because of the crime of violence. Further, the court observed that while there is room for disagreement over whether the "ordinarily" language in § 5H1.3 provides some latitude for departure, any deficits of the defendant "would have to be of an order so exceptional or extraordinary as to take the defendant out of the pool of defendants similarly situated

who have equally compelling life stories and have faced equally compelling difficulties.  I just do not think that that is this case."  The court encouraged Jones to raise the issue on appeal.

Also at sentencing, Jones sought to have the court disregard the two juvenile convictions in his record because the sometimes unreliable criminal record-keeping CORI system was the only basis for their inclusion.  The court agreed and did not take the juvenile convictions into account at sentencing, thus lowering Jones' Criminal History Category from II to I.

On appeal, Jones concedes that he did not preserve in the district court his potential Booker claim that the district court would have given him a lower sentence had the Guidelines not been mandatory.  Therefore, this court reviews the sentencing decision for (1) error that is (2) plain and that (3) affects substantial rights and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings.  United States v. Gonzalez-Mercado, 402 F.3d 294, 302 (1st Cir. 2005); United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005).  "The Booker error is that the defendant's Guidelines sentence was imposed under a mandatory system." Id. at 75.  The first two elements of the plain error standard are satisfied where, as here, a defendant's sentence was imposed by reference to a mandatory system of federal sentencing guidelines.  Id. at 77.

To meet the third requirement of the plain error test, "ordinarily the defendant must point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new 'advisory Guidelines' Booker regime." Id. at 75. A defendant cannot satisfy the third element by a "mere assertion that the court might have given [him] a more favorable sentence." Id. at 80. Likewise, the fact that the district court sentenced Jones to the low end of the applicable Guidelines range does not, by itself, show a reasonable probability of a lesser sentence under the advisory system. United States v. Kornegay, 410 F.3d 89, 99-100 (1st Cir. 2005).

A defendant must show, "either in the existing record or by plausible proffer," that "there is reasonable indication that the district judge might well have reached a different result under advisory guidelines." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005). If a district court made statements suggesting that it would have been inclined to impose a lesser sentence but was prevented from doing so by the mandatory nature of the Guidelines, that indicates that there is a reasonable probability that the defendant's sentence was affected by a Booker error. Heldeman, 402 F.3d at 224; Antonakopoulos, 399 F.3d at 81.

Jones argues that the comments by the district court judge at the sentencing hearing show that there is a reasonable

-20-

probability that the district court would impose a different sentence more favorable to the defendant. The government disagrees. As both parties quote selectively from the district court's remarks at the sentencing hearing, we set forth in toto the court's comments regarding its decision not to depart downward:

> Of course we are, in a sense, confined somewhat to the margins of the case, given the fact that there is a seven-year mandatory consecutive sentence which we all agree simply has to be imposed under operation of law.
>
> I think it is a difficult issue. As I read 5H1.3, the intent of the Guidelines is to exclude consideration of mental and emotional state unless by cross-reference it is relevant to the consideration of another ground for departure set out in Subpart 2 of k. And I think everyone instantly went to exactly the right Policy Statement in the Subpart, which is 5K2.13, which would be the Guideline that one would look to for a departure, but for the fact of actual violence and threat of violence in the underlying crime.
>
> Whether the general Policy Statement in H itself establishes an independent ground for departure, I think is one that reasonable jurists could disagree over, although I defer to Judge Posner's reading of the word "ordinarily" [Pullen, 89 F.3d at 370] as operating independently of the cross-reference to K Subpart 2.
>
> But if it is a basis for independent departure, while I agree that Dr. Mart is an excellent witness, and I have no reason to doubt anything he said in his assessment of the defendant, and while I think the defendant has genuine deficits, if H is a ground for a departure, they would have to be of an order so exceptional or extraordinary as to take the defendant out of the pool of defendants similarly situated who have equally compelling life stories and have faced equally compelling difficulties.
>
> I just do not think that that is this case. So I will decline to depart under either 5K2.13 or 5H1.3.

The district judge then advised defense counsel that he

-21-

might on the appeal raise this 5H1.3 issue. I, during the break, was looking desperately for any case in the First Circuit, and I did not find one that discusses it specifically, and opposed to mental health problems generally. There are those cases that use the extraordinary and exceptional language, but I did not see any that address the precise issue that you were raising.

We interpret the above remarks as indicating the district court's belief that even if it had had the discretion under § 5H1.3 to depart downward in an extraordinary case, it did not consider Jones' case to be out of the ordinary, hence not rising to the level of extraordinary cases for which departure would be warranted. While the court's language cannot be said to foreclose the possibility of a lesser sentence under advisory guidelines, it in no way indicates there is a reasonable probability that it would impose a lower sentence under advisory guidelines. The judge showed commendable concern and thoughtfulness while pondering the sentence, but we see little to suggest anything else. Jones argues that § 5K1.2's prohibition against a departure prevented him from having the judge consider mitigating evidence at this sentencing, but the judge did consider the mitigating evidence presented by defense counsel and heard the testimony of the psychologist. We conclude that Jones has failed to demonstrate a reasonable probability of a different sentence and thus decline to remand.

The defendant's conviction and sentence are **<u>affirmed</u>**.