# United States Court of Appeals
## For the First Circuit

No. 21-1753

JOHN A. CHARRON,

Plaintiff, Appellant,

v.

COUNTY OF YORK; WILLIAM L. KING, JR., individually and in his
official capacity as Sheriff of York County; RACHEL A. HORNING,
individually and in her official capacity as Deputy Sheriff of
York County; DARREN CYR, individually and in his official
capacity as Deputy Sheriff of York County; HEATH MAINS,
individually and in his official capacity as Deputy Sheriff of
York County; STEVEN THISTLEWOOD, individually and in his
official capacity as Deputy Sheriff of York County; WILFRED
VACHON, individually and in his official capacity as Deputy
Sheriff of York County,

Defendants, Appellees,

CHRISTOPHER MOSS; ERIC J. PILVELAIT,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Barron, Chief Judge,
Selya and Kayatta, Circuit Judges.

Gregory O. McCullough, with whom Sanford Law Offices was on
brief, for appellant.

John J. Wall, III, with whom Monaghan Leahy, LLP was on brief, for appellees.

---

September 27, 2022

---

**KAYATTA**, <u>**Circuit Judge**</u>. Plaintiff John Charron was arrested in March 2016 after a confrontation among neighbors left a Pontiac Sunfire abandoned in a snowbank. An occupant of the Sunfire alleged that Charron had pushed the car into the snowbank using his plow truck -- an allegation Charron denied. Deputies of the York County Sheriff's Office arrested Charron and charged him with several crimes. Charron worked to develop a body of exculpatory physical evidence that pointed strongly towards his innocence. The charges against him were eventually dropped, after which Charron brought an array of federal and state-law claims against the County of York and various County officials.[1] The district court granted summary judgment for the County defendants. For the following reasons, we now affirm.

## I.

On the night of March 8, 2016, an individual who requested anonymity called 911 to report a disturbance at his neighbor's house.[2] He reported hearing "a lot of tires burning out, spinning out, a lot of people screaming, yelling, swearing

---

[1] Charron also brought claims against Christopher Moss and Eric Pilvelait, whose role in this case we will shortly explain. The final judgment against Moss and Pilvelait is not before us on appeal, and we do not discuss the claims against them further. As used in this opinion, "defendants" does not include Moss and Pilvelait.

[2] The night's events evidently spilled over into the early morning hours of March 9.

and stuff," "a lot of people yelling 'I'm gonna fucking kill you,' and stuff like that." The caller said it sounded "like people fighting pretty bad." Dispatch told officers that the caller had reported "some sort of disturbance" involving "a lot of yelling, cars burning out, [and] males yelling threats." Dispatch said that the caller had reported the address as "the second house on the right" on "Langley Shores Drive" in Acton, Maine.

Deputies Rachel Horning and Darren Cyr were both dispatched to the area. On their way, they received notice that a female caller on Buzzell Road wanted her son removed from the house.[3] Buzzell Road is less than half a mile from Langley Shores (plural) Drive. They are connected by Langley Shore (singular) Drive. Dispatch noted that the two calls involved locations "fairly close to each other" and stated that they "may be related."

Horning recounted that when she arrived at the Buzzell Road home, she found Christopher Moss ("Moss") and his parents Walter and Denise.[4] Moss claimed to have been at the house of his

---

[3] That call apparently involved at least one hang-up, and the Sheriff's Office was unable to reconnect.

[4] At various points in this opinion, we draw upon the content of Horning's arrest report narrative. In a footnote, Charron cites a Federal Rule of Evidence concerning hearsay and asserts that "the County Defendants cannot rely on any statements in Horning's narrative because she is not a party opponent." Yet Charron never analyzes the many other considerations involved in determining whether a statement constitutes hearsay and, if so, whether it is nevertheless admissible. Given his cursory treatment of the issue and his own repeated reliance on the narrative's contents, see F.R. Evid. 106, we deem his putative hearsay objection to Horning's

friend, Eric Pilvelait, when Pilvelait's neighbor, Charron (who is decades older than Moss and Pilvelait), came to the house in his plow truck.[5]  According to Moss, Pilvelait and Charron had a long-running feud.  Moss said that when Charron got to Pilvelait's driveway, he began "peeling his tires" and "yelling threats."  Moss claimed that he and Pilvelait got into Pilvelait's car, that Charron lifted his plow and struck the car, that the plow scraped over the hood of the car, and that both airbags deployed.  Moss claimed that Charron then pushed the car down to the end of the street.  Moss said that Charron yelled "[y]ou guys are fucking dead," and that Moss feared for his life.  Horning noted that she "could see and smell that [Moss] had been drinking."  At some point, Horning photographed what she described as injuries Moss claimed to have sustained in the crash.[6]

---

narrative and its contents waived for lack of development.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[5]  Pilvelait evidently lives on Buzzell Road.  The narrative in Horning's arrest report says that Pilvelait's house is on Langley Shores Drive, though the report elsewhere lists Pilvelait's address as being on Buzzell Road.  Horning tried to speak with Pilvelait at his house before proceeding to Charron's home.  No one answered the door.  Neither party alleges on appeal that Horning mistakenly visited the wrong house on the night of March 8.

[6]  Charron speculates these photographs may have been taken after the night in question and disputes whether they show any injuries.  The photographs appear to show blood on Moss's forehead.

Moss's father Walter told Horning that Charron had called him twice that night. The first time, Charron said that Pilvelait and Moss "were laying rubber strips in his driveway and that someone was going to get hurt." The second time, Charron said that "he had his plow truck and he was going to take [Pilvelait and Moss] into the ditch." Walter said that he went to go collect his son and Pilvelait, but that when he arrived, Charron "had already pushed them down the road."

Horning -- who was by this time with other officers -- examined Pilvelait's car (a Pontiac Sunfire) where it had crashed into a snowbank, apparently near the intersection of Langley Shore Drive and Langley Shores Drive.[7] Horning believed the damage to the Sunfire (along with car parts strewn in the road) was consistent with Moss's story. She tried to interview Pilvelait at his house, but no one answered the door.

Along with officers Heath Mains and Steven Thistlewood, Horning and Cyr proceeded to Charron's house, where he was arrested. Charron says that when the officers arrived, he protested, "I didn't do anything. They rear-ended me. Why are you arresting me? They came to my house and terrorized me." Charron was taken to jail, where he declined to provide a statement

---

[7] Charron's counsel would ultimately provide pictures of Charron's truck next to another Sunfire of the same make and model. But, as used in this opinion, "the Sunfire" refers to the car driven by Pilvelait on the night of March 8.

to Horning. Horning's arrest report indicated that Charron was arrested for aggravated reckless conduct and criminal threatening.

Horning signed a Uniform Summons and Complaint charging Charron with aggravated reckless conduct.[8] He was released on a $3,000 cash bail, subject to conditions of release that initially included, among other things, (1) a prohibition against using or possessing alcoholic beverages; (2) a prohibition against possessing firearms; and (3) submission to searches "at any time without articulable suspicion or probable cause." Sheriff William King published details of the allegations against Charron, including in a statement posted to Facebook.

The police photographed the Sunfire on the night of the incident but did not take it into evidence. Instead, the car was towed. Charron later located the Sunfire and his attorney purchased it on May 10 "to preserve it as evidence."

On June 7, Charron was indicted on one count of aggravated reckless conduct; two counts of aggravated assault; two counts of criminal threatening with a dangerous weapon; and one count of driving to endanger.

---

[8] Aggravated reckless conduct is the only charge that appears on Charron's Uniform Summons and Complaint. His bail bond paperwork lists both aggravated reckless conduct and criminal trespass, but the parties on appeal do not suggest that Charron was actually charged with criminal trespass. A police press release stated that Horning had charged Charron with aggravated reckless conduct and criminal threatening. We do not discuss criminal trespass further.

Charron later provided the prosecutor with a crash analysis interpreting physical markings on the Sunfire to indicate that the car had collided with the back of Charron's truck. That scenario was consistent with Charron's claim that the Sunfire had rear-ended him and inconsistent with Moss's claim that the collision had occurred head-on. The report also concluded that there was "no objective physical evidence on the [Sunfire] that suggests that [Charron] was able to lift the plow on the front of [his truck] and drop it onto the hood" of the Sunfire.

In July 2016, the prosecutor dismissed the case against Charron because the prosecutor was "no longer certain about what had occurred" on the night in question.

As to what actually transpired on March 8, defendants now largely admit the key features of Charron's version of events: The Sunfire's driver peeled the car's tires in Charron's driveway, its occupants yelled threats, and the car sped away. Charron unsuccessfully pursued the Sunfire in his truck. The Sunfire then returned and rear-ended Charron. Charron got his truck free of the Sunfire and returned home. He heard the Sunfire race to the end of Langley Shore Drive and discerned that the car had become stuck in the snow. He got back into his truck and drove to the end of Langley Shore Drive to get a closer look. As he backed away towards home, Moss exited the Sunfire and chased him. When Charron reached home, Moss banged on his door, yelled for him to

come out, and broke the passenger-side window of Charron's truck. Walter Moss then arrived at Charron's house and left with his son.

Charron filed this suit against the County, its sheriff, the four officers involved in his arrest, and a court officer who was not present for the events of March 8, but who later relayed information between police and the prosecutor assigned to Charron's case.[9] As relevant on appeal, Charron claimed violation of his civil rights, false arrest, false imprisonment, malicious prosecution, and defamation per se. Central to Charron's case is the notion that County officers knew or should have known that Moss's version of events was false.

In a comprehensive order, the district court granted summary judgment for the County defendants. See Charron v. Cnty. of York, No. 18-cv-00105, 2020 WL 1868767 (D. Me. Apr. 14, 2020). The court concluded that Charron had not shown any constitutional violation and that, even if he had, qualified immunity would shield the County officials from liability for false arrest, malicious prosecution, and failure to preserve or disclose evidence. Id. at *41-48. The court rejected Charron's claims of municipal and supervisory liability. Id. at *48-49. The court further rejected Charron's state-law claims for false arrest, false imprisonment, malicious prosecution, and defamation per se. Id. at *49-52. And

---

[9] As explained above, Charron also brought claims against Moss and Pilvelait that are not before us on appeal.

in any event, the court continued, Maine's discretionary-function immunity would shield the County defendants from liability for the conduct at issue. Id. at *52-53.

## II.

We review the district court's grant of summary judgment de novo. Velazquez-Ortiz v. Vilsack, 657 F.3d 64, 70 (1st Cir. 2011). We will affirm "if the record, viewed in the light most favorable to the [non-movant], reveals no genuine issue of material fact and demonstrates that the movant is entitled to judgment as a matter of law." Id.

## A.

We begin with Charron's federal claim for false arrest, his state-law claim for illegal arrest, and his claims for false imprisonment. To survive summary judgment on the two arrest claims, Charron must show that a jury could reasonably conclude that the officers lacked probable cause to arrest him. See, e.g., Karamanoglu v. Town of Yarmouth, 15 F.4th 82, 87 (1st Cir. 2021) (explaining that the federal constitutional tort of false arrest arises from arrests made without probable cause and without legal process); Richards v. Town of Eliot, 780 A.2d 281, 292 (Me. 2001) (officers entitled to summary judgment on state-law claim for illegal arrest because a jury could not reasonably find that officers lacked probable cause to arrest). And he affirmatively agrees that, for purposes of this appeal, his false imprisonment

- 10 -

claim rises and falls with the probable cause determination. The parties do not argue that the probable-cause inquiry differs between federal and Maine law, and we assume that Maine law tracks the federal inquiry.[10]

"Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime." United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)). The probable-cause inquiry "focuses on what the officer knew at the time of the arrest" and evaluates "the totality of the circumstances." Id. The "inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest." Id.

"Probable cause 'is not a high bar.'" District of Columbia v. Wesby, 138 S. Ct. 577, 586 (2018) (quoting Kaley v. United States, 571 U.S. 320, 338 (2014)). "[U]ncorroborated

---

[10] The parties quibble over who should be considered the arresting officer. Contrary to Charron's assertions, we think this dispute immaterial to the summary judgment analysis. Likewise, Charron's insistence that "[n]one of the deputies made a determination of probable cause" is irrelevant to the probable-cause analysis -- "an objective inquiry" in which "[t]he 'actual motive or thought process of the officer is not plumbed.'" Holder v. Town of Sandown, 585 F.3d 500, 504 (1st Cir. 2009) (quoting Bolton v. Taylor, 367 F.3d 5, 7 (1st Cir. 2004)).

- 11 -

testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause." Karamanoglu, 15 F.4th at 87-88 (alteration in original) (quoting Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 10 (1st Cir. 2004)).  To be sure, "courts will not ignore 'facts tending to dissipate probable cause.'"  Id. at 88 (quoting Ramirez v. City of Buena Park, 560 F.3d 1012, 1023-24 (9th Cir. 2009)).  But even "where a witness account is disputed, police officers do not have an 'unflagging duty' to complete a full investigation before making a probable cause determination."  Id. (quoting Acosta, 386 F.3d at 11).

In debating whether the facts known to the officers objectively establish probable cause of an offense justifying an arrest, the parties focus their attention on the offense of aggravated reckless conduct.  So shall we.

Maine law provides that "[a] person is guilty of aggravated reckless conduct if the person with terroristic intent engages in conduct that in fact creates a substantial risk of serious bodily injury to another person."  Me. Stat. tit. 17-A, § 213.  Terroristic intent means the intent to "[c]ause serious bodily injury or death to multiple persons" "for the purpose of intimidating or coercing a civilian population or to affect the conduct of government."  Id. § 2(25) (2013).[11]  And serious bodily

_____

[11] Terroristic intent can also mean the intent to "[c]ause substantial damage to multiple structures" or "to critical

- 12 -

injury is defined as "a bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or loss or substantial impairment of the function of any bodily member or organ, or extended convalescence necessary for recovery of physical health."  Id. § 2(23).  Charron does not dispute that ramming the Sunfire with a plow truck and pushing it and its multiple occupants down the road would satisfy the elements of aggravated reckless conduct, so any argument to the contrary is waived, and we may assume for the purposes of this case that such conduct would suffice.  Our inquiry therefore turns on whether the officers had probable cause to believe that Charron engaged in that conduct.

As we have explained, Walter Moss told Horning that Charron called him and said "that someone was going to get hurt" and that "he was going to take [Moss and Pilvelait] into the ditch."  Christopher Moss told Horning that Charron had made good on these threats by striking the Sunfire with his plow truck with enough force to cause the airbags to deploy and pushing the car down the road.  Horning then observed the Sunfire in a snowbank. Its airbags were deployed and it had suffered "excessive damage," including "scrape marks coming from the windshield all the way

---

infrastructure" "for the purpose of coercing a civilian population or to affect the conduct of government."  Me. Stat. tit. 17-A, § 2(25).

- 13 -

down." She also saw car parts in the street as she approached the Sunfire. She then found a plow truck in Charron's driveway. She later testified that she "looked at" the plow on Charron's truck that night, but did not check to see how high the plow could be raised.

Charron insists that Moss's story was facially implausible (and actually impossible) for a number of reasons, including the location and position of the Sunfire when the pushing purportedly began; the length and shape of the road down which he allegedly pushed the Sunfire; the location of car parts in the street; the fact that officers found the Sunfire front-first in the snowbank; and the appearance of tire treads leading into the snow. He argues that the gouge marks on the Sunfire's hood did not correspond to any protrusions on his snow plow (but did correspond to protrusions under his rear bumper), and that "[a]ll that was needed to confirm" Charron's version of events "beyond any doubt . . . was a tape measure and letting Charron show the height of his plow blade at maximum height." He says that Moss was unreliable because, among other things, officers should have suspected Moss of criminal activity based on his father's story and his mother's contact with 911. And he contends that officers should have credited Charron's claim that the younger men had harassed and rear-ended him.

In making these arguments, Charron misapprehends the probable cause standard. Probable cause requires only a "fair probability." Illinois v. Gates, 462 U.S. 213, 238 (1983). "It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt." Gerstein v. Pugh, 420 U.S. 103, 121 (1975). The officers were not accident reconstructionists analyzing precise measurements from a critical distance. They were initially dispatched in response to reports of men yelling threats and peeling tires. Walter Moss's story indicated that Christopher Moss and Pilvelait had at some point driven down to Charron's driveway, while Christopher Moss recounted Charron yelling threats near Pilvelait's driveway. These events are not mutually exclusive. Moreover, any arguable inconsistency in these stories does not defeat probable cause. Cf. Karamanoglu, 15 F.4th at 88 ("[P]robable cause to believe one person committed a crime by definition does not foreclose the possibility that probable cause would also exist to believe another person committed the same or a parallel crime.").[12] Whoever had

_____

[12] Similarly, to the extent Charron claims that he told officers on the night of his arrest that Moss had smashed his truck window, that fact would not preclude an inference that Charron had first rammed the Sunfire as alleged. As for the glass on Charron's rear bumper, he develops no argument on appeal that the officers observed the glass on the night of his arrest.

been the initial aggressor, this was clearly a volatile situation that had escalated into a dangerous one. Walter Moss reported that Charron had threatened "to take [Moss and Pilvelait] into the ditch," and, lo and behold, Pilvelait's car was found in a snowbank. Nor do we find it unreasonable to believe that a truck with its plow crashed onto the hood of a car could push the car down a winding road and then brake to let it spin into a snowbank. Given Charron's threat and the physical evidence consistent with that threat (at least at a high level of generality), there was ample reason to believe that Charron struck the Sunfire with his plow truck and pushed it down the road, where it ultimately landed in the snowbank.[13] Although Charron protested that he had been the victim, "[a] reasonable police officer is not required to credit a suspect's story." Cox v. Hainey, 391 F.3d 25, 32 n.2 (1st Cir. 2004). And "the availability of alternative inferences does not prevent a finding of probable cause so long as the inference upon which the officer relies is reasonable." Id. at 32. That the officers' initial view of events turned out to be unsubstantiated

---

[13] Charron protests that officers should not have relied on Walter Moss's statement that by the time he arrived to collect his son, Charron "had already pushed them down the road" because Walter had not witnessed the alleged vehicular confrontation. But Walter's statement to that effect is unnecessary to establish probable cause. Likewise, we need not rely on the written witness statements of Moss or Pilvelait, which Charron suggested below were collected after his arrest. Finally, our conclusion does not require crediting Horning's assertion that Charron appeared intoxicated.

- 16 -

does not negate probable cause to arrest. "[O]n the record before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." Hill v. California, 401 U.S. 797, 804 (1971).

What's more, we "have rejected the proposition that a police officer has a standing obligation to investigate potential defenses or resolve conflicting accounts prior to making an arrest." Holder v. Town of Sandown, 585 F.3d 500, 505 (1st Cir. 2009). Instead, "an officer normally may terminate her investigation when she accumulates facts that demonstrate sufficient probable cause." Acosta, 386 F.3d at 11. So Charron's arguments that the officers should have taken up a tape measure or got him to raise his plow to its maximum height are unavailing.

On this record, no reasonable jury could find facts that would lead to a determination that the officers lacked probable cause to arrest Charron. This conclusion dooms Charron's arrest-specific claims. Likewise, Charron develops no argument that his false imprisonment claims can survive a finding that probable cause existed to arrest him.

**B.**

We turn next to Charron's federal and state malicious prosecution claims. These causes of action are similar, though not identical. To make out a federal Fourth Amendment malicious prosecution claim, Charron must show that "the defendant

(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Hernandez-Cuevas v. Taylor, 723 F.3d 91, 101 (1st Cir. 2013) (quoting Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012)).[14] Under Maine law, malicious prosecution requires showing "(1) [t]he defendant initiated, procured or continued a criminal action without probable cause; (2) [t]he defendant acted with malice; and (3) [t]he plaintiff received a favorable termination of the proceedings." Trask v. Devlin, 788 A.2d 179, 182 (Me. 2002). Both causes of action thus share a common requirement -- the absence of probable cause, either to justify the seizure (as required to make out a Fourth Amendment claim) or to justify the criminal action (as required by Maine law). We begin and end our analysis with this requirement.

As we have explained, there was probable cause at the time of Charron's arrest. On the other hand, we think it clear that the evidence marshalled by his attorney that led to the dismissal of his prosecution clearly eliminated that probable cause. Simply put, the facts confirmed and presented in the crash analysis procured by Charron's attorney rendered unreasonable any

[14] Because we ultimately find, as we will explain, that the defendants did not cause charges to be initiated or maintained against Charron without probable cause, we need not consider whether a contrary such finding may have opened the door to a procedural due process claim under federal law. See Thompson v. Clark, 142 S. Ct. 1332, 1337 n.2 (2022).

- 18 -

continued claim that Charron's truck rammed or pushed the car. Rather, it appears very likely that the car hit the truck from behind as Charron claimed. So we can narrow our inquiry to determining whether any defendant caused or extended the prosecution (or the seizure) after learning of the facts that eliminated the probable cause.

We begin with the March 9 Uniform Summons and Complaint signed by Horning. In so doing we assume without deciding that such a complaint can constitute legal process for the purpose of a malicious prosecution claim. We also assume without deciding that the conditions to which Charron was subject while released on bail constituted a seizure for the purpose of his Fourth Amendment claim.

We have already determined that there was probable cause to arrest Charron for aggravated reckless conduct on March 8. And we see nothing in the record that would support a finding that Horning had acquired new exculpatory information by March 9. Charron did not provide a statement to officers detailing his version of events once at the jail. Nor does Charron allege that officers conducted an additional physical investigation before Horning issued the initial complaint, such as by returning to examine his truck or plow or measuring the distance between the marks on the hood of the Sunfire. And to the extent that Charron alleges inconsistencies between Moss's initial account of events

and written witness statements from Moss and Pilvelait, he does not argue on appeal that Horning collected the relevant statements before signing the Uniform Summons and Complaint. In short, Charron has not raised a triable question as to whether, by March 9, any defendant had come into possession of facts that defeated the probable cause that existed on March 8.

That brings us to the superseding complaint filed on March 23 and the indictment secured on June 7. Both of these charging actions were taken by Assistant District Attorney Kyle Myska. Myska is not a defendant in this lawsuit, and Charron develops no argument on appeal that the County is vicariously liable for Myska's actions. As a result, Myska's own conduct in filing the March 23 complaint and procuring the June 7 indictment cannot form the basis of Charron's malicious prosecution claims. That does not end our inquiry, though, because Charron also alleges that the officers withheld exculpatory information that would have persuaded Myska not to pursue charges against Charron. We will assume without deciding that the withholding of exculpatory information so as to cause a prosecution to continue could, as a matter of Maine law, create a viable claim of malicious prosecution. Similarly, we will assume that such a withholding that causes a seizure to continue could as a matter of Fourth Amendment law create a viable claim.

In pressing this argument that the defendants caused Myska to do something that Myska would not have otherwise done, Charron confronts a problem of causation. In chronicling the information he claims the defendants withheld, Charron lists his protestations of innocence, photos taken on the night of the arrest, photos of the Sunfire a few days later, photos taken by Deputy Shaw, and the car's whereabouts. But the record shows that after Myska received all of this information he continued with securing an indictment and pursuing the prosecution even after discussions with Charron's counsel. Myska put the brakes on only after Charron's counsel produced the expert's accident reconstruction. And no one suggests that the defendants withheld that report.

To the extent Charron suggests that Myska never received Shaw's photographs, this contention is belied by the photos' inclusion in a disclosure Charron's counsel said that he received from Myska during discovery. To the extent Charron faults Horning for failing to relay other information from Shaw, that claim also fails. When Shaw emailed Horning the photos he'd taken of Charron's truck, he said:

> John requested I photograph his truck in the day light, in an attempt to prove his point. John's claim is the pair re[ar-]ended his truck where it sits. He had the portland press harold there telling his story . . . so here ya go if you want them.

- 21 -

Charron says that he never claimed his truck was rear-ended in his driveway and notes that he was not present when Shaw took the photographs. But even if the information in Shaw's email (or otherwise relayed from Shaw to Horning) was helpful to Charron, the record indicates that Myska was aware of Charron's theory before procuring the indictment, and that the state simply took the position that Charron was not truthful. Myska obtained the indictment against Charron even after Charron's counsel argued to him that the collision could not have occurred as the state claimed and furnished photos and videos purporting to demonstrate as much. Charron has not raised a triable issue as to whether the outcome would have been different if Myska had possessed more information from Deputy Shaw.

Charron also faults the police officers for failing to secure the Sunfire and "allow[ing] or caus[ing] it to be concealed from the prosecutor and defense counsel" and court officer Vachon "for taking no real action to locate, secure, and produce the Sunfire." But the record is clear that Charron's own lawyer had the Sunfire weeks before Myska obtained the indictment.

Charron has thus failed to raise a triable issue as to whether any of the named defendants caused the initiation or continuation of his prosecution or seizure without probable cause. Given this conclusion, we need not discuss any remaining elements of Charron's federal or state-law malicious prosecution claims.

- 22 -

## c.

Charron also raises a federal due process claim, which he styles as a claim for "the failure to preserve and the active concealment of exculpatory evidence."[15] He relies on out-of-circuit precedent for the proposition that he can prevail by showing that "(1) the defendant destroyed exculpatory evidence in bad faith or engaged in other misconduct (2) that caused a deprivation of the plaintiff's liberty." Armstrong v. Daily, 786 F.3d 529, 551 (7th Cir. 2015). We assume for the purposes of this case that Charron has correctly articulated the law in arguing that the defendants' actions caused Myska to do something that Myska would not have otherwise done. But see Lewis v. City of Chicago, 914 F.3d 472, 479 (7th Cir. 2019) ("[T]he Fourth Amendment, not the Due Process Clause, is the source of the right in a § 1983 claim for unlawful pretrial detention, whether before or after the initiation of formal legal process."). We also assume Charron suffered a qualifying liberty deprivation. Even so, his claim fails for essentially the reasons already discussed in analyzing his malicious prosecution claims. Simply put, before

---

[15] We have said that "a procedural due process claim may not be redressed under section 1983 where an adequate state remedy exists." Reid v. New Hampshire, 56 F.3d 332, 341 (1st Cir. 1995). We note that Charron's state-law malicious prosecution claim and his federal due process claim seem to rest on substantially the same underlying facts. But defendants do not argue on appeal that Charron's procedural due process claim is foreclosed by the presence of an adequate state-law remedy.

obtaining the indictment Myska had all the material information that the officers had.[16]

This ends our discussion of Charron's alleged constitutional injuries. Because we conclude that none of Charron's constitutional claims against the officers can survive summary judgment, we need not discuss his claims of supervisory or municipal liability. See Wilson v. Town of Mendon, 294 F.3d 1, 6-7 (1st Cir. 2002) ("[If an] officer has inflicted no constitutional harm, neither the municipality nor the supervisor can be held liable." (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam))).

**D.**

Finally, Charron brings a state-law defamation claim against Horning and Sheriff King. Under Maine law, defamation requires: "(a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement

---

[16] To the extent that Charron takes issue with the fact that Myska "did not receive the measurement photos and other bound items conclusively linking the signature marks on the hood of the Sunfire to the protrusions on the underside of the rear bumper of Charron's plow truck until June 13, 2016, a week after Charron was indicted," those photos and accompanying items were procured and furnished by Charron's counsel, not County officers. So it is not clear how the timing of their provision to Myska could form the basis of a due process violation by County officers.

irrespective of special harm or the existence of special harm caused by the publication." Rice v. Alley, 791 A.2d 932, 936 (Me. 2002) (quoting Lester v. Powers, 596 A.2d 65, 69 (Me. 1991)).[17] "Words that falsely charge a punishable offense" are defamatory per se, and do not require showing "special harm beyond the publication itself." Rippett v. Bemis, 672 A.2d 82, 86 (Me. 1996) (discussing slander). What's more, "true but incomplete statements [can] fulfill the falsity requirement, thus forming the basis for liability in a defamation action when those statements falsely impute criminal conduct to the plaintiff." Schoff v. York Cnty., 761 A.2d 869, 871 (Me. 2000).

On appeal, Charron focuses his defamation claim on a "press release, which resulted from Horning's narrative and which [King] asked her to fact-check."[18] The information posted on the Sheriff's Office's Facebook page reads as follows:

> Last night (March 8, 2016) at approximately 11 PM, York County Sheriff's Deputeies [sic] were summoned to the 200 block of Buzzell Road in Acton for a report of a disturbance. The caller reported that cars were peeling out their tires, yelling, and they heard people yelling.

---

[17] Defendants on appeal develop no argument that Charron must show more than negligence.

[18] In his statement of the case, Charron says that his defamation claim concerns "a press release and related communications to the media and posted on the Sheriff's Facebook page, which they have allowed to remain uncorrected on the Internet." But his subsequent argument focuses on omissions from "King's press release."

At the same time, another call was received that reported a domestic disturbance at a residence on Lake Shores Road. Deputies soon determined that the Buzzell Road and Lake Shores Road calls were related.

Deputies learned that a neighborhood "feud" had boiled over and John Charron, 53, of Acton had confronted one of his neighbors with whom he has had a feud. According to witnesses, Charron drove his plow truck to the end of his neighbor's driveway and was squealing his tires and yelling threats to the neighbors.

The neighbor, who had a friend visiting, got into the friend's vehicle that was parked in the driveway. According to the victims, Charron drove at them with his plow raised and struck the victim's vehicle with the plow blade going over the hood. The impact caused both airbags to deploy. The victims suffered bumps and bruising but did not require hospitalization.

Deputy Rachel Horning and other deputies apprehended John Charron and Horning charged him with aggravated reckless conduct and criminal threatening. Bail was set at $3000 cash.

Charron posted $3000 cash bail earlier this afternoon. Charron is scheduled to appear in Alfred Superior Court on April 8, 2016.

Another statement in the record is substantially identical with the exception of the first paragraph's last sentence, which reads: "The caller reported that cars were peeling out their tires, yelling, and threat[en]ing other people." Because this small difference does not affect our analysis, we treat the two statements as one ("the press release").

- 26 -

The district court rejected Charron's defamation claims. The court explained that Charron's claim against King failed because Charron "failed to demonstrate that Sheriff King in his synoptic report to the public the day after the arrest knew or should have known what the whole story was and decided to publish only a 'partial truth.'" Charron, 2020 WL 1868767 at *52 (quoting Schoff, 761 A.2d at 872). And the court held that Charron's claim against Horning failed because he had not "establish[ed] that she published anything." Id.

In his briefing to us, Charron develops no argument refuting the logic of the district court's ruling. Without such argumentation, we decline to disturb the district court's conclusions. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).[19]

### III.

We do not minimize the months-long ordeal visited upon John Charron as the result of apparently false allegations. But on this record, Charron has failed to raise a triable issue as to whether the County defendants are legally liable for his misfortune. Confronted with a violent interaction of some type, a witness who said Charron threatened to push the car into a ditch,

---

[19] Because we determine that none of Charron's claims can survive summary judgment, we need not consider whether he would have been entitled to punitive damages.

- 27 -

an occupant of the car who said that Charron made good on his threat, and a car in a snowbank, the officers had probable cause to end the altercation by arresting Charron.  That they turned out to be wrong simply illustrates the substantial difference between probable cause and certainty.

The judgment of the district court is <u>affirmed</u>.